**INNOVATIVE OFFICE SYSTEMS, INC., Appellant,**

v.

**Jim JOHNSON d/b/a Electro Image, Appellee.**

**No. 12–93–00104–CV.**

Court of Appeals of Texas, Tyler.

May 31, 1995.

Rehearing Overruled July 7, 1995.

---

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

HOLCOMB, Justice.

This is an appeal from a judgment that was entered in a DECEPTIVE TRADE PRAC-TICES–CONSUMER PROTECTION ACT case. Ap-pellee, Jim Johnson d/b/a Electro Image ("Johnson"), sued Appellant, Innovative Of-

fice Systems, Inc. ("Innovative"), to recover damages resulting from the lease of a color copier, computer equipment, and computer software. Johnson alleged causes of action under DTPA, common law fraud, breach of contract, breach of warranties, negligent misrepresentation and rescission. Innovative counterclaimed for declaratory judgment alleging that Johnson had breached his lease agreement on the computer equipment. In a non-jury trial, Johnson restricted his claims against Innovative to DTPA violations, breach of contract, and breach of warranty. The trial court found that Innovative was liable for: (1) violations of "the laundry list" of the DTPA; (2) unconscionable conduct; and (3) breach of express or implied warranties. The court further found that Innovative's conduct was done "knowingly," and awarded Johnson actual damages in the amount of $146,335.00, additional damages in the amount of $100,000, and attorney's fees. Innovative challenges the legal and factual sufficiency of the evidence to support the court's findings. Innovative also contends that the court erred when it failed to find, as a matter of law, that Johnson did not mitigate his damages, Innovative did not accept the lease, and that Johnson did not breach the lease. We will affirm.

Beginning in 1989, Johnson owned and operated Electro Image, a computer graphics business in Tyler. Electro Image is a service bureau that accommodates advertising agencies and corporate graphics departments that need high caliber art work on printed materials, such as sales brochures.

Innovative sells and services office equipment. In January, 1991, Innovative's Regional Sales Manager, Mike Dobbins ("Dobbins"), convinced Johnson to enter into a long-term lease for a new Canon color laser copier ("CLC–200"). Johnson used the Canon CLC–200 solely as a color copier. To produce high quality color graphics, Johnson created the original art work in black and white, colored the black and white graphic by hand, and reproduced the original on the multi-color copier. Although Johnson considered this method undesirable, he was not aware that a more efficient, fully computerized color machine was available on the market.

In July 1991, the ceiling of Johnson's building fell on top of the CLC–200. Johnson contacted Innovative and began a series of conversations with Dobbins that resulted in Dobbins proposing that Johnson upgrade his equipment to an interfaced computerized color printing system. The system Dobbins proposed included an upgraded copier, the Canon CLC–500 copier, an independent processing unit, a memory board, and a software package that was new on the market called SuperPrint.

The *key component* of the proposed upgraded system was the SuperPrint software program. Using the special software, the proposed system would enable Johnson to design an image directly on the computer screen and the CLC–500 copier would serve as a printer and reproduce the color graphic image. By upgrading to a new, more expensive color copying system, Johnson reasoned that he could eliminate the time intensive step of creating the original art work by hand, which would allow him to produce high quality graphics on a more affordable basis.

Johnson had reservations and concerns about the upgraded system, and Dobbins referred Johnson to Innovative President, Harry Farnham, ("Farnham"). Farnham had an "almost unlimited hardware capability" to determine the viability of any software that was new on the market. As part of his expertise, Farnham gave feed-back to developers of software, such as Canon, on the effectiveness of any new software that entered the market.

To ensure that Innovative understood Johnson's expectations for the proposed new system, Johnson gave Dobbins a list of nine specifications of the factors that were important to Johnson if Johnson were to decide to upgrade his system. In turn, Dobbins gave all of Johnson's specifications to Farnham so that "[Farnham] would know exactly where we would be going with the software." The nine specifications that Johnson considered important were:

1. The system had to be an integrated solution from one vendor;

2. The system had to operate on Windows 3.0;

3. The system had to enable the color laser copier as a scanner;

4. The system had to produce PostScript output;

5. The system must operate on Johnson's computer, an IBM PS/2 platform;

6. The system had to work with Johnson's large library of PostScript Type I fonts;

7. The system must be suitable for a service bureau clientele and accept digital input from other IBM programs using industry standard formats;

8. The software solution must be upgradable should better hardware solution enter the market, and;

9. The system had to be cost effective.

Johnson was satisfied with the performance of his CLC–200 copier; therefore, the upgrade to the CLC–500 was only attractive to him if there was a workable software solution to make his output less time consuming and more affordable. Realizing this, Farnham sent Johnson approximately 100 pages of information on the new SuperPrint software program, including a flyer which made the following representations:

- Get maximum effectiveness from your Canon color laser copier

- Maximum speed

- Maximum resolution

- Maximum connectivity

- Maximum return on your investment

- SuperPrint is a software solution to Windows lack of support for color devised [and] printing quality and speed

- SuperPrint is the best solution for printing to Canon Color Laser Copiers directly from such popular applications as CorelDRAW! [a graphics software used by Johnson]

- SuperPrint generates scalable screen and printer fonts on-the-fly

- Service bureau printing

- Get fast throughput

- Attract more customers who use Windows applications

- Reduce headaches with easy to use page description files

- Maximize the return on your investment in Canon equipment

In reliance on the representations that the proposed system would, at a minimum, satisfy Johnson's nine basic specifications, Johnson signed a 65 month lease on the upgraded hardware.

In September, 1991, Dobbins paid Johnson's expenses to attend a color laser copier software product fair and training seminar. At the software show, Johnson, Dobbins, and Farnham saw a demonstration of the software that would be compatible with Johnson's new system. The demonstration included two software packages, Colorbus and SuperPrint 3.0/Z–Script. Johnson testified that the demonstration was impressive and looked like everything Dobbins had told him it was going to be. He watched examples of the system's output and was furnished with samples of the output after the demonstration. One sample stated: "Printed to the Canon Color Laser Copier 500 *PostScript* interpreted by Zenographics *SuperPrint* Distributed by Colorbus."

That same day, Farnham and Dobbins introduced Johnson to Paul Peffer, a representative of Colorbus. Peffer informed Johnson that the SuperPrint 3.0/Z–Script that had been demonstrated was not available at the show because the packaging and the instruction manual for the software had not been completed. Although the SuperPrint 3.0/Z–Script was not available, Peffer told Johnson that he could get the SuperPrint 2.0 software, which would produce a lower grade, but similar output as the SuperPrint 3.0/Z–Script. If Johnson agreed to order the 2.0 SuperPrint software, Peffer agreed to give Johnson a good price and agreed to ship the SuperPrint 3.0/Z–Script to Johnson "the minute that it was available" at no additional

charge. Peffer represented to Johnson that the SuperPrint 3.0/Z–Script would be available in November of 1991.

At the conclusion of their discussion, Colorbus sold the software to Innovative, which then leased it to Johnson. The order form for the software was attached as a supplement to Innovative's original lease. The lease, as supplemented, attempted to obligate Johnson to make 65 monthly payments totaling $96,876.00.

As Dobbins prepared the order form, Johnson discussed with Peffer the details of the manner in which the software would be adapted to Johnson's equipment. Peffer told Johnson that Innovative would install the software and would be Johnson's sole source of technical support for the system. After hearing Peffer's representations to Johnson that Innovative would be responsible for assembling, troubleshooting, and repairing Johnson's system, Dobbins decided to confirm Peffer's statement with Farnham. Thereafter, Dobbins told Johnson, "Harry [Farnham] has agreed. [Innovative is] going to take care of the whole works. We'll take care of you, Jim."

In October 1991, Johnson received the SuperPrint 2.0 software. When Johnson called Dobbins and requested that Innovative install his new equipment, Dobbins told Johnson to call Farnham to find out who was going to put the system together. Farnham told Johnson that it would probably be better if Johnson put it together himself. After Johnson protested, Farnham advised Johnson to contact a representative of Colorbus for assistance.

Johnson eventually assembled the system, but nothing worked except for the CLC–500, which he used only as a color copier. Again, Johnson called Farnham and Farnham agreed to send some Innovative technicians to assist Johnson. The technicians discovered that the cable provided by Innovative had been miswired. After a new cable was installed, Johnson's system still would not work. Again, Farnham advised Johnson to contact Colorbus. Johnson contacted Ruben Gooch with Colorbus, who confirmed various settings with Johnson. Johnson made the recommended adjustments, but the system still would not operate.

Innovative then sent its software expert, Jeff Woiton, to assist Johnson with the system. Woiton discovered that the hardware was defective, that a memory board was missing, and that another adjustment had to be made to the hardware. After two new memory boards were delivered, Johnson attempted again to make the new system operational.

The system never produced output at the level that had been demonstrated. At the software show demonstration, the proposed new process took only 12 minutes for the first copy, and thereafter, the machine would produce several copies per minute. After spending "hundreds of hours" between October 1991 to January 1992 in an attempt to make the system work, Johnson finally "threw in the towel," stating that he worked as much as he could "without totally destroying [his] business." Shortly thereafter, Johnson began having medical problems and was treated for an ulcer.

At trial, the court heard testimony from 13 witnesses and reviewed numerous exhibits. In entering a judgment in favor of Johnson, the court found that: (1) Innovative violated the "laundry list" set out in the DTPA; (2) Innovative's conduct was unconscionable; (3) Innovative breached express or implied warranties made to Johnson; and (4) Innovative's actions were fraudulent. As a result, the court awarded Johnson the following damages:

| Actual Damages | Amount |
| --- | --- |
| Lease Payments | $ 8,700.00 |
| Expansion Costs | $ 8,434.00 |
| Rent Differential | $ 10,615.00 |
| Lost Profits | $ 96,586.00 |
| Mental Anguish | $ 20,000.00 |
| Pre-judgment Interest | $ 8,541.47 |
| Attorney's Fees | $ 30,000.00 |
| **Total** | **$182,876.47** |

| Statutory Damages | Amount |
| --- | --- |
| Mandatory Trebling | $ 2,000.00 |
| Additional Damages | $100,000.00 |
| **Total** | **$102,000.00** |

SCOPE AND STANDARD OF REVIEW

On appeal, Innovative asserts 11 points of error, each of which complains of the legal or factual sufficiency of the evidence to support the court's findings. In reviewing a legal sufficiency of the evidence challenge, we review only that evidence in the record which favors the challenged finding and any reasonable inferences that can be drawn therefrom. *Ben Fitzgerald Rlty. Co. v. Muller*, 846 S.W.2d 110, 119 (Tex.App.—Tyler 1993, writ denied); *Rodarte v. Cox*, 828 S.W.2d 65, 73 (Tex.App.—Tyler 1991, writ denied). Reviewing a challenge to the factual sufficiency of the evidence, we must consider all of the evidence in the record, and may set aside the finding and order a new trial only if the judgment is so against the great weight and preponderance of the evidence that the judgment is manifestly unjust. *Id.*

As to those findings for which Innovative had the burden of proof, the Court must first examine the record for evidence and reasonable inferences that supports the trial court's failure to find, and ignore all evidence to the contrary. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 687 (Tex.1989). If there is no evidence to support the failure to find, the court may then examine the entire record to determine whether Innovative established the proposition as a matter of law. *Id.*

SUFFICIENCY OF THE EVIDENCE TO
SUPPORT THE TRIAL COURT'S
FINDINGS ON LIABILITY

In points of error one through five, Innovative challenges the legal and factual sufficiency of the evidence to support the trial court's findings of liability. Under the TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, the court found that the following actions by Innovative constituted "false, misleading, or deceptive acts or practices":

1. Johnson was taken to a demonstration of the promised Superprint 3.0/Z–Script software, but Innovative switched the 3.0/Z–Script software for the SuperPrint 2.0 and assured Johnson that the 3.0/Z–Script would be available in November, 1991 or December, 1991 at no extra charge;

2. Representing that the system had characteristics, uses, benefits, and qualities that it did not have;

3. Representing that the Innovative System was of a PostScript standard or quality, when it was not;

4. Advertising the Innovative system through its affiliation with Colorbus at the Dallas demonstration with an intent not to sell the components of the system as demonstrated or advertised.

5. Failing to disclose to Johnson that the SuperPrint 3.0/Z–Script program would not reach the market as early as promised;

6. Representing that the system would meet Johnson's nine specifications for a system.

7. Representing that by agreeing to lease Superprint 2.0, Johnson would get SuperPrint 3.0/Z–Script at a later date for no extra charge; and

8. Representing that Innovative would be solely responsible for assembling, troubleshooting, and repairing Innovative's system.

It is Innovative's contention that Johnson's problems were limited to the SuperPrint software rather than the hardware furnished by Innovative. With the exception of a memory board that was mislabeled by the manufacturer, Innovative points out that the CLC–500 and the Colorbus software operated satisfactorily. In leasing the SuperPrint 2.0 software, Innovative argues that Johnson relied upon the representation of Colorbus, rather than the representations of Innovative. To recover under the DTPA, Innovative correctly argues that Johnson had to prove that misrepresentations were made by Innovative and that Innovative is not "guilty" of a DTPA violation merely by its association with Colorbus. *See Colonial Leasing Co. of New England v. Kinerd*, 733 S.W.2d 671, 674

**948**

(Tex.App.—Eastland 1987), *reversed on other grounds*, 800 S.W.2d 187 (Tex.1990) *Qantel Bus. Systems, Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 305 (Tex.1988).

Innovative also contends there were reasonable explanations for the unsatisfactory performance of Johnson's system that do not implicate Innovative or the products that Innovative provided to Johnson. Innovative claims that the system's poor performance was caused by Johnson's attempt to put too much information into the system, which caused the system to overload.

■ However, it is undisputed that Johnson leased the upgraded hardware system from Innovative subject to Innovative providing suitable software. Although both Dobbins and Farnham represented that the necessary software would be available in the near future, the software was only in its developmental stages and was still not available at the time Johnson brought this case to trial.

Finally, the hardware that Innovative leased to Johnson was defective. The cable was miswired, one memory board was wrong, and another memory board was missing. In viewing only the evidence and inferences in support of the court's findings on liability, and weighing all of the evidence, the evidence is legally and factually sufficient to support the court's findings that Innovative's actions were false, misleading, or deceptive. Point one is overruled.

■ The evidence was also sufficient to support the court's findings that Innovative's actions were unconscionable. Under the DTPA, "unconscionable action or course of action" is defined as:

An act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

TEX.BUS. & COM.CODE ANN. § 17.45 (Vernon 1987). To prove that Innovative's conduct was unconscionable, Johnson had to prove that the conduct resulted in unfairness that was "glaringly noticeable, flagrant, complete and unmitigated." *Kennemore v. Bennett*, 755 S.W.2d 89, 92 (Tex.1988). Unconscionability must be determined by examining the entire transaction, not merely the conduct prior to the execution of the lease. *Griffith v. Porter*, 817 S.W.2d 131, 136 (Tex.App.—Tyler 1991, no writ).

■ Innovative argues that Johnson wanted to be on the "cutting edge" of technology in the area of his specialty and that Innovative merely gave him the opportunity to take advantage of a new product on the market. Innovative further claims that it was just as misled as Johnson was by Colorbus' representations that the 3.0/Z–Script was coming on the market.

However, Dobbins and Farnham knew that Johnson needed a software program that was compatible with the upgraded hardware that Innovative had leased to Johnson. With this knowledge, Innovative sent written material to Johnson that contained numerous representations about the SuperPrint software that were misleading to Johnson.

Innovative knew that the SuperPrint 2.0 was significantly different from the SuperPrint 3.0/Z–Script. The box containing the SuperPrint 2.0 software specifically stated that the program provided "fast, beautiful/postscript-quality output." Farnham admitted that the representation on the software box was misleading. The box also represented that the SuperPrint 2.0 was compatible with Johnson's system, the IBM/PS–2 and Windows 3.0. Evidence offered at trial revealed that the SuperPrint software had never been tested on an IBM/PS–2 computer. Johnson would not have leased the upgraded hardware had he not relied on Innovation's representations. The evidence was sufficient to support the court's findings that Innovative's actions were unconscionable. Point two is overruled.

### FRAUD

The court also found that Innovative's representations were committed knowingly and

with either an actual intent to deceive Johnson or with a reckless disregard for the truth. In addition, the court found that the representations were material, that Johnson relied on those representations and that those representations were false. The court's findings constitute a cause of action for common law fraud. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983).

■ Evidence supporting the court's findings revealed that many of Innovative's representations to Johnson about the upgraded system were false. Dobbins represented that the upgraded system that Innovative was recommending to Johnson would turn the CLC–500 into a printer that would mass produce quality graphics. Before Innovative leased the hardware to Johnson, Innovative knew the importance of the nine specifications that Johnson had listed for the new system. Although Farnham admitted that Innovative's system failed to satisfy four of the nine specifications, the evidence reveals that Innovative's system in reality did not meet *any* of Johnson's specifications. The system did not produce postscript output, it did not operate on Johnson's computer, it did not work with Johnson's library of fonts, it was not suitable for Johnson's industry clientele because it would not accept digital input from IBM programs using standard industry formats, and it was not an integrated system from one vendor.

Prior to the software show, Farnham knew that the SuperPrint 3.0/Z–Script was not available on the market. Knowing this, Innovative still leased the upgraded equipment to Johnson. Innovative also knew that substituting the SuperPrint 2.0 was also not an acceptable solution. Farnham testified that he knew that the SuperPrint 2.0 was not the Postscript version as early as July 1991. However, in September, 1991, Innovative's representatives told Johnson that it was PostScript quality. The SuperPrint 2.0 software that Innovative leased to Johnson never worked and the SuperPrint 3.0/Z–Script was never provided; therefore, Johnson's new system was never capable of fully computer-

ized color printing. Points three and four are overruled.

### SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDINGS ON BREACH OF EXPRESS OR IMPLIED WARRANTIES

■ The evidence also reveals that Innovative breached express or implied warranties. *See* TEX.BUS & COM.CODE ANN. § 2A.210 (Vernon Supp.1993) and § 2.313 (Vernon 1968). Innovative's representation that its system would satisfy Johnson's nine specifications constituted an express warranty. *See* TEX.BUS. & COM.CODE ANN. § 2A.210 (Vernon Supp.1993) and § 2.313 (Vernon 1968). Because Innovative was a merchant, the implied warranty of merchantability also arose, which required Innovative to provide Johnson with a system that was "fit for the ordinary purposes for which goods of that type are used." *See* TEX.BUS. & COM.CODE ANN. §§ 2A.212 and 2.314. Innovative had reason to know the purpose for which Johnson's new hardware and software would be used and Johnson relied on Innovative's expertise and judgment to select suitable goods. Innovative's knowledge of Johnson's specific needs created an implied warranty that the goods that it leased to Johnson would be fit for the particular purpose that Johnson's needs dictated. *See* TEX.BUS. & COM.CODE ANN. §§ 2A.213 and 2.315.

■ Innovative argues that it disclaimed any express or implied warranties in its lease with Johnson. The difficulty with this argument is that the court found that the lease was ineffective because the lease was never executed or accepted by Innovative. Furthermore, a consumer cannot waive protection under the DTPA. *First Title Co. of Waco v. Garrett,* 802 S.W.2d 254, 255 (Tex. 1990).

■ Innovative was also bound by an implied warranty to install, to repair or to modify the system in a good and workmanlike manner, which also cannot be waived. *Melody Home Manufacturing Co. v. Barnes,* 741 S.W.2d 349, 354 (Tex.1987). The soft-

ware leased by Johnson from Innovative never worked with the upgraded hardware that Innovative had recommended to Johnson. As difficulties arose with Johnson's system, Innovative was hesitant to assist Johnson and primarily left him to deal with the Colorbus representative from California. Point five is overruled.

### SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDINGS ON DAMAGES

In points six and eight, Innovative challenges the factual sufficiency to support the court's award of damages in the amount of $152,876.47 and the court's award of $30,000 as reasonable attorney's fees. Innovative argument is two-fold. It argues that Johnson's damage claim was too speculative, and that Johnson failed to prove that Innovative's conduct was a producing cause of whatever damages were incurred.

▮▮▮ First we address the issue of producing cause. A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produced the injury complained of." *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). There may be more than one producing cause of injuries. *Id.*

▮▮▮ In support of its contention, Innovative relies on the testimony of Ruben Gooch, the Colorbus representative, who attempted to assist Johnson in Johnson's efforts to make the new system work. Innovative concludes that Gooch "testified without contradiction that ... the problems with [Johnson's system] was the interaction of Windows 3.0 and the massive number of fonts on [Johnson's] system." Gooch admitted that he had never used the type of computer that Johnson owned and that Johnson was a competent operator; therefore, Gooch did not attribute the difficulties with Johnson's system to "operator error." Gooch stated that the problem with Johnson's system seemed to either be the software or the incompatibility of the software with the hardware. In essence,

Gooch did not have a solution to the problems that Johnson was having with the upgraded system.

Other evidence that was before the court was the testimony of Dobbins. Dobbins acknowledged that Johnson's new system was not complete without the software, and that without a workable software solution, Johnson's upgrade from a CLC–200 to a CLC–500 copier was not necessary. Dobbins also confirmed that the full color output and scanning devices were important to the viability of Johnson's business and that delays in the operation of the upgraded system would cost Johnson money.

Johnson testified that if Innovative's system had operated as represented, his business would not have lost profits. In weighing all of the evidence, the trial court's finding of producing cause was not clearly wrong or manifestly unjust.

Next, we address Innovative's challenge that the trial court's award of actual damages is not supported by sufficient evidence. The trial court awarded Johnson actual damages in the amount of $8,700 as reimbursement of Johnson's payments for the upgraded system; $8434.00 for the expansion and downsizing of Johnson's business; $10,615.00 in rent differential cost in moving to a larger rental space to accommodate the upgraded equipment; lost profits of $96,586.00; mental anguish damages of $20,000. Additionally, the trial court awarded Johnson $100,000 in statutory damages for Innovative's "knowing misconduct." Of the seven areas of damages awarded, Innovative challenges the court's award of lost profits, relocation costs, and rent differential.

Innovative asserts that the evidence is "factually insufficient and too speculative" to support the amounts awarded to Johnson for lost profits. Although Innovative acknowledges that Johnson was successful in a similar business venture in California, Innovative argues that Johnson started his business in Tyler with a limited understanding of the business environment in Tyler. It argues that Johnson sought to fill a "narrow and

unstable niche in the Tyler marketplace," which was providing small runs of color sales brochures to small businesses. To be successful in Tyler, Innovative argues that Johnson needed a breakthrough in computer-interfaced copier technology and that without such a breakthrough, Johnson's products would remain uncompetitive and unaffordable to his potential customers. We do not agree.

A degree of conjecture always enters into a determination of lost profits. To recover for lost profits, a party must show by competent evidence the amount of the loss with reasonable certainty. *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983); *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938). Where the business is established and making a profit at the time when the contract was breached or the tort committed, such profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. *White*, 651 S.W.2d at 262.

What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992). The requirement of "reasonable certainty" in the proof of lost profits is intended to be sufficiently flexible to accommodate the myriad of circumstances in which claims for lost profits arise. *Texas Instruments v. Teletron Energy Mgt.*, 877 S.W.2d 276, 279 (Tex.1994). In calculating a plaintiff's loss, it is proper to consider the normal increase in business that might have been expected in light of past development and existing conditions. *Id.* The fact that a business is new is but one consideration in applying the reasonably certain test. *Id.* The focus is on the experience of the persons involved in the expertise, the nature of the business activity and the relevant market. *Id.*

Here, Johnson and an accountant, Jerry Garrett, testified. Johnson testified that his business in Tyler was his third suc-

cessful business. The first business venture was a woodworking business. He started the second business in 1973, which was an advertising, marketing, and graphics business in southern California. In 1987, Johnson created a business plan for Electro Image in Tyler. In 1988, he moved to Tyler and spent two weeks visiting over 50 businesses to examine the equipment, output, and customer base. In July 1989, Johnson began Electro Image.

At trial, Johnson offered various exhibits in an effort to show the impact that the transactions with Innovative had on Johnson's business. One exhibit was a spreadsheet for Johnson's business from July 1989 until November 1992. The spreadsheet summarized gross sales, net revenue, and adjusted net revenue. Attached to this opinion is a graph that visually displays the information by showing trend lines for the same time period. (See attached APPENDIX.)

From July 1989, when Johnson's business began, through August 1991, when Johnson received Innovative's system, Johnson's business was growing at 15% per month. Based on actual growth of 15% per month, Johnson testified that his expectation of projected future earnings was also 15%.

In making the projection for lost profits, Johnson and Garrett used the four month period of May 1991 through August 1991, because those were the months that immediately preceded Johnson's lease of the CLC–500 system. Johnson and Garrett provided testimony supporting four damage models on the issue of lost profits, which varied according to the level of projected growth:

| | |
|---|---|
| 0% growth | $ 96,586. |
| 4% growth | $164,057. |
| 10% growth | $455,014. |
| 15% growth | $789,138. |

Each model that was presented projected lost profits for 22 months. Although Johnson admitted that he did not lose any big customers, he stated that he turned away business because he could not deliver the product as he had advertised in the yellow pages and other media.

Garrett testified that he had been in public accounting since 1977 and had been a certified public accountant since March 1984. He stated that he was familiar with the financial history of Johnson's business and assisted in the preparation of the spreadsheets, the graph for the adjusted gross income with trend lines, and the projection of lost profits. In his 17 years of accounting, Garrett had reviewed the finances of many new businesses. Although Johnson's business experienced yearly losses, the business was profitable beginning in January 1991.

In Garrett's opinion, Electro Image was an established business and the 15% growth scenario for lost profits was consistent with the actual history of the business. Garrett also testified that he considered the 0% and 4% growth models to be a conservative estimate. According to Garrett, the isolation of the months of May–August 1991 to determine an average of the profitability of Johnson's business was reasonable because those four months immediately preceded the delivery of Innovative's upgraded system.

The other evidence that was before the trial court was the testimony of Mark Baiter, Innovative's expert witness. Baiter testified that he had been a certified public accountant for 18 years and that he also had extensive experience with small businesses. Baiter's testimony was conflicting, but he agreed that Johnson's graph shown in the Appendix demonstrated that "the general trend was an upward sales growth" for Johnson's business. Baiter agreed with Garrett that Johnson's business was not a new business. He also testified that Johnson's business was profitable from at least January 1991 to August 1991. Assuming a significant event occurred in September 1991 that caused a drop in revenue, Baiter testified that projecting the future earnings based upon data from May 1991 to August 1991 was reasonable. He stated: "I would have to find compelling evidence to indicate that a longer period of time *would not* better indicate that." Baiter also stated that he knew of no better time period to use as a basis for the projection of lost profits and that the method used by

Johnson and his expert in calculating lost profits was reasonable. As to the history of the business, Baiter stated: "it shows some increasing growth, then it fell down after the alleged event that you are talking about ... the more prudent projection [for Electro Image] would be continued growth."

Despite the testimony of Johnson and his expert, the trial court based its award of lost profits on a 0% rate of growth, the lowest of the four projections that is supported by the evidence. The trial court's award of lost profits was supported by sufficient evidence and was conservative.

Innovative also challenges the sufficiency of the evidence to support the court's award of Johnson's relocation costs and rent differential. It is undisputed that part of the out of pocket expense that Johnson incurred as a result of Innovative's conduct was the expense of relocating. Dobbins admitted that the CLC–500 was much larger than Johnson's previous equipment and it was necessary for him to rent additional space to accommodate it. As a result, Johnson incurred $10,615 in rent differential and $8,434 for the cost of renovating the space to accommodate the larger system.

■ Innovative argues that Johnson benefitted from moving Electro Image to a larger building because he moved his business to a building that was owned by a trust which was owned by Johnson and his wife; therefore, Innovative concludes that Johnson paid rent to the trust and "was his own landlord." We do not agree.

Even though Johnson paid rent to a trust in which he and his wife were the trustees, such action is not necessarily inappropriate and does not mean that Johnson is his own landlord. A trust is a separate legal entity; therefore, Johnson's payments to the trust for rental space for Electro–Image were not self serving.

■ Next, Innovative contends that the evidence at trial "conclusively proves" that Johnson failed to mitigate his damages. It

argues that Johnson cannot recover damages from Innovative unless Johnson took reasonable steps to mitigate his damages. Innovative's suggestions as to the manner in which Johnson could have mitigated his damages include Johnson's lack of effort in unloading fonts from the RAM of his computer, working with Innovative to find another software solution, and obtaining a new or used copier to replace the CLC–500.

However, Innovative failed to request the trial court to make an affirmative finding regarding mitigation of damages. *See MBank Abilene, N.A. v. Westwood Energy Inc.,* 723 S.W.2d 246, 253 (Tex.App.—Eastland 1986, no writ). In addition, Innovative failed to establish, as a matter of law, that Johnson failed to mitigate his damages. Each of Innovative's suggestions of ways that Johnson could have mitigated his damages are lacking support in the record. Any problem caused by Johnson overloading his hard drive were resolved by Johnson. The solution that Johnson found was also used by Dobbins with his customers who had similar problems. Other software solutions were not available to Johnson until January 1992, which was after Johnson had spent numerous hours attempting to make the SuperPrint 2.0 work with his hardware. Acquiring a new or used copier system to replace the CLC–500 was not a viable option because Johnson had depleted his resources in an attempt to make Innovative's system work. Points seven and eight are overruled.

In its ninth point of error, Innovative challenges the sufficiency of the evidence to support the court's finding that Innovative did not accept the lease. Johnson signed the lease agreement, but the lease failed to state the date on which the lease was effective. The lease was not executed by Innovative and the lease specifically stated that the lease was not effective until it was signed and executed by Innovative. Innovative argues that the missing term regarding the commencement of the lease and the missing execution is irrelevant because Innovative performed under the contract when it delivered the equipment and Johnson performed under

the contract when he made lease payments. Thus, Innovative argues that the existence of the lease and Johnson's breach of the lease was established by law.

■ Viewing only the evidence that is favorable to the court's finding, the terms of the lease agreement specifically state that the lease does not become effective until it is signed by Innovative. It is undisputed that Innovative never signed the lease. Therefore, there is some evidence to support the court's finding that Innovative never executed or accepted the lease and Innovative failed to establish that it executed and accepted the lease as a matter of law. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

■ In its tenth point of error, Innovative contends that the court erred when it failed to find that Johnson breached the lease. However, Innovative failed to request the trial court to make a finding that Johnson breached the lease. Failure to request the trial court to make a finding waives error on appeal. *MBank Abilene N.A. v. Westwood Energy, Inc.,* 723 S.W.2d at 253; *Home Indemnity Co. v. Muncy,* 449 S.W.2d 312, 316–317 (Tex.Civ.App.—Tyler 1969, writ ref'd n.r.e.). Point ten is overruled.

In its eleventh point of error, Innovative challenges the sufficiency of the evidence to support the court's award of $30,000 in attorneys' fees. Innovative argues that Johnson's attorney only made conclusory statements concerning the services that have been rendered; therefore Innovative reasons that the evidence was insufficient for the court to verify the attorney's assertions or question the reasonableness or necessity of the services that had been provided.

■ In determining the reasonableness of attorney's fees, we look to the entire record and consider the testimony, amount in controversy, nature of the case, and common knowledge and experience as lawyers and judges. *Argonaut Inc. Co. v. ABC Steel Products Co.,* 582 S.W.2d 883, 889 (Tex.

App.—Texarkana 1979, writ ref'd n.r.e.). The reasonableness and necessity of attorney's fees are fact questions and must be supported by evidence. *American Commercial Colleges, Inc. v. Davis,* 821 S.W.2d 450, 455 (Tex.App.—Eastland 1991, writ denied).

The record reflects that Johnson's attorney testified that he had reviewed the file and that the actual amount of legal work that had been done, in addition to the work that was anticipated to have been done in the trial court, equaled to 200 hours, which brought the entire billing to $30,000. Johnson's attorney qualified himself as an expert and stated that, in his opinion, $30,000 was the sum that was necessary and reasonable for the litigation. Johnson's attorney stated that his opinion was based on the factors for determining a reasonable fee under TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT 1.04, a survey on attorney's fees in the *Texas Bar Journal,* December 1992 edition, and his knowledge of attorney's fees in the community. He also stated that the hourly rate of $150 per hour was reasonable.

Innovative's attorney gave similar testimony and stated that $25,000 was a reasonable fee for his representation of Innovative. In view of the record and our experience, we hold that there was some evidence supporting the amount of attorney's fees awarded to Johnson and that the evidence was not so insufficient that the judge's award was manifestly unjust. Point eleven is overruled.

The trial court's judgment is **affirmed.**

APPENDIX A