**SUMMIT MACHINE TOOL
MANUFACTURING
CORP., Appellant,**

v.

**GREAT NORTHERN INSURANCE
COMPANY and Chubb & Son,
Inc., Appellees.**

No. 03–98–00166–CV.

Court of Appeals of Texas,
Austin.

July 29, 1999.

J. Hampton Skelton, Skelton & Woody, Austin, for Appellant.

Michael C. Lawrence, Schell, Beene & Vaughan, L.L.P., Dallas, for Appellees.

Before Justices JONES, B.A. SMITH and YEAKEL.

BEA ANN SMITH, Justice.

Appellant Summit Machine Tool Manufacturing Corporation ("Summit") sued its insurance carriers, appellees Great Northern Insurance Company and Chubb & Son, Inc. (together "Chubb"),[1] for various causes of action relating to Chubb's failure to pay Summit's claim under an insurance policy covering the shipment of manufacturing machines. The jury awarded Summit compensatory and exemplary damages; however, it also found that Summit willfully concealed or misrepresented material facts relating to the claim and that Chubb had not waived this policy defense. Based on the jury's answer to this question, the trial court rendered a take-nothing judgment in Chubb's favor. Summit raises five issues on appeal. We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Summit manufactures and sells industrial machinery. In 1987, it arranged to sell to various Mexican entities several hun-

---

1. At the time of the claims, Chubb & Son, Inc. was the claims manager for Great Northern. Great Northern is also a member of the group of insurance companies The Chubb Group. Unless the context indicates otherwise, we will use "Chubb" to include Great Northern.

dred machines for making precision automotive bearings. The sale was never consummated, however, and Summit sued the Mexican entities. As part of a settlement, Summit received $13 million and retained ownership of the machines, which it stored in a warehouse in Puebla, Mexico for several years. In 1991, Summit arranged to sell the machines to a Slovakian company. To prepare for the transatlantic shipment, Summit began to transport seventy-two truckloads of machinery from Puebla to Oklahoma City in mid–1992.

Prior to shipment, Summit purchased primary insurance from the Mexican insurer Asegudora Mexicana, S.A. ("Asemex") to cover transit-related property damage en route from Puebla to Oklahoma City. Summit also bought Differences in Conditions, Differences in Limits, and Excess coverage ("DIC/DIL/Excess coverage") from Chubb as secondary coverage against damage occurring in transit between Puebla and the United States unloading point in Laredo, Texas.[2] The DIC/DIL/Excess policy would pay only if the primary policy did not pay, or, if after exhaustion of the Asemex policy limits, the full amount of the claim had not been paid. Under the terms of the policy, Chubb had the option to pay Summit either the value of the damaged property or the cost to repair or replace the machinery. The policy also contained a "concealment or misrepresentation" clause stating: "This insurance is void as to all insureds if, whether before or after loss, you willfully conceal or misrepresent any material fact or circumstance relating to this insurance."

When truckloads of damaged machinery began to arrive in Oklahoma City in July 1992, Summit notified Asemex and Chubb of a potential claim. Summit, which valued the machinery at $20,035,347.86 at the time of loss, made a formal demand to Asemex, the primary carrier, for $16,674,-694.16 in transit damages. Asemex refused to pay this amount, and Summit

initiated arbitration proceedings in 1993 against Asemex before the Comisión Nacional de Seguros y Finanzas, in effect the Mexican Insurance Commission. Asemex did not deny coverage, but stated that Summit had not complied with the terms of the policy by failing to substantiate its claimed damages to the machines.

During this period, Summit expressed to Chubb that it was anxious to begin repairs on the machines so that it could sell them to the Slovakians with a warranty. After Chubb representatives inspected the damaged machinery, Summit began repairing the machinery in December 1992. Summit kept records of the hours and costs it incurred, and later submitted these records to Chubb.

In June 1993, Summit sent Chubb a letter demanding payment of $16,674,-694.16. Summit informed Chubb that Asemex had effectively denied its claim by thus far refusing to pay: "Accordingly, Summit now looks to Chubb and Arkwright for coverage under the applicable policies." Summit asked Chubb to "concede coverage and admit liability" on Summit's claim. Chubb responded that Summit had not filed a sworn statement of loss as required under the policy. In July, Summit requested a statement-of-loss form, and Summit's counsel stated in a letter to Chubb that he would assist in preparing it. In August, Summit sent Chubb the loss statement, in which Summit's vice president Dale Redman swore under oath that Summit's loss under the Chubb policy was $16,674,694.16, the same amount it had claimed under the Asemex policy. Chubb rejected the loss statement, asserting that Summit did not provide credible documentation to substantiate a loss in that amount.

In March 1994, Summit and Asemex entered into a settlement agreement under the following terms: Asemex would pay Summit $3.6 million, in exchange for which

2. Summit also obtained excess coverage between Laredo and Oklahoma City from the Arkwright Mutual Insurance Company. That

coverage is not at issue, since Arkwright was dismissed from the lawsuit and is not a party to this appeal.

Summit would release its claim against Asemex and terminate the Mexican Insurance Commission proceedings. The agreement defined Summit's claim against Asemex as one for "alleged damage to certain machinery and equipment, occurring on various dates...." Summit's general counsel David Shear signed the settlement agreement on behalf of Summit, and Asemex paid Summit the agreed amount.

Summit filed suit against Chubb, Great Northern, and Arkwright in 1995. Chubb moved for summary judgment, arguing that because Asemex paid Summit $3.6 million to settle its claim, the limits of Summit's primary insurance had not been exhausted; therefore, Chubb argued, its secondary coverage was not triggered as a matter of law. The trial court denied Chubb's motion, and the case was tried to a jury under Oklahoma law.

At trial, Summit took the position that the Asemex settlement did not constitute a payment by the primary carrier on Summit's insurance claim. Jack Golsen, the board chairman and president of Summit's parent company, was one of Summit's primary witnesses. Golsen testified that the $3.6 million settlement with Asemex was not paid on Summit's claim for transit damages under the policy; instead, he claimed that the payment was solely in settlement of tort claims against Asemex for defamation and threats of arrest and extradition allegedly made against Golsen and other Summit officials. However, Golsen acknowledged that the settlement was not paid out to himself or any other executives personally, but was placed on Summit's general ledger as a receipt for equipment costs.

David Shear, Summit's general counsel, gave similar testimony in his deposition, which was read to the jury at trial. Shear testified: "We were paid strictly on our tort claims and not on our cargo claim. We were required to sign this agreement in order to get the money for that." When

asked if the Asemex agreement settled Summit's claims for transit damages, Shear stated: "When you say settled it, we didn't get any money for that, [but] were we required to give a general release, the answer is yes."

Other evidence contradicted Golsen's and Shear's testimony about the nature of the Asemex settlement. The settlement agreement nowhere stated that the $3.6 million payment was solely for the alleged tortious conduct of Asemex. Summit's expert on Mexican law testified—and Shear acknowledged—that the Mexican Insurance Commission did not have jurisdiction over tort claims. Jim Jones, the treasurer and corporate controller of Summit's parent company, testified that the $3.6 million Asemex settlement was posted as a credit to reduce Summit's "unrecovered costs." Jones defined these costs as "the carrying value that we had on our books when the inventory was in Mexico; all the costs that had to be incurred to return that equipment to the U.S., the costs that we have incurred to repair the damages; the costs to ship the product to Slovakia." He confirmed that none of the settlement money was given to any individual executives at Summit.

Golsen testified that he did not speak with Summit's or its parent company's accounting departments prior to making the claim for $16,674,694.16. Instead, Golsen arrived at that number by taking 85%[3] of the total value of the machinery in brand-new condition, a percentage that "was kind of what I thought in talking to other people in the industry was about a ball-park number" to have machines repaired and remanufactured, including two-way shipping costs. When asked why Summit used the $150 per hour labor rate in spreadsheets it sent to Asemex and Chubb, Golsen testified:

> We couldn't really get them into a dialogue on the claim. It was to try to

**3.** Summit's claim amount of $16,674,694.16 is actually 83.23% of the $20,035,347.86 figure Summit claimed as the machinery's value at the time it was damaged. We have found nothing in the record that explains this discrepancy.

show them—try to get them to the table to sit down and discuss, you know, what would be reasonable for this claim, and to reach some kind of agreement with them so that we could go ahead and fix those machines.

Golsen defended using the $16,674,694.16 figure as merely an estimate to negotiate with its insurers because Summit was "cash-poor" and needed money to get the machines fixed so that they could be shipped to Slovakia with a warranty. However, he could not point to any correspondence in which Summit expressed to Chubb that the figure was only an estimate rather than a firm claim. He also acknowledged that Summit had received $12,310,000 in advance payments from the Slovakian purchasers in 1992, and had received $13 million in settlement of the suit that arose after the thwarted sale of the machines to the Mexican entities.

Much of the evidence at trial related to the condition of the machinery before and after shipment, as Chubb attempted to discredit Summit's $16,674,694.16 claim by showing that the machines had not been remanufactured before they left Puebla. The machines were "decades old," some from the 1940s and 1950s. Summit purchased some of them used, and some were used machines from Summit's plant. After the sale to the Mexican entities fell through, the machines sat in a warehouse in Puebla for four years unconnected to any power source. Before they were shipped to Mexico, Summit cleaned and painted the machines, "fixed the obvious," and filled them with lubricating fluid. Summit's engineering expert, Scott Gregory, examined some of the machines in Puebla in 1991 and testified that they were "old machines, freshly painted" that did not look like they had been remanufactured.

Jim Rose, one of Chubb's experts, examined the machines after they arrived in Oklahoma City. Some had been painted over without being repaired, old motors and wires had not been replaced, and he saw sludge in hydraulic lines and rusted components. Rose testified that the machines had not been rebuilt or remanufactured prior to shipping. Eugene Keith, an expert originally employed by Arkwright to investigate the damage to the machines in connection with the Asemex claim, first examined the machines in July 1992. Keith testified that the transit damage was minimal compared to the damage from wear and tear. He estimated the transit damage to be $550,000, whereas his estimate of the total cost to repair the machines, *including* damages for wear and tear, was $3,196,000.

Chubb's accounting expert, Robert Matthews, reviewed Summit's repair log reflecting the time and money Summit expended repairing the machines. Summit marked up the cost of its parts 100%, according to Westerman. While Summit claimed to have paid a labor rate of $150 per hour for machine repair, Matthews calculated from the records that Summit actually paid an average wage of $8.76 for the repair work. He estimated the transit damage to the machines at $1,968,781. Using three different methodologies, Matthews estimated an average cost to repair *all* damage, including non-transit damage, at $2,416,972.

The jury found (1) that the defendants breached the insurance contract, (2) that the defendants committed constructive fraud in selling the policy, and (3) that Chubb's refusal to pay Summit was a breach of Chubb's duty of good faith and fair dealing. The jury determined that $6,750,000 would compensate Summit for the damage in transit between Puebla and Laredo, and it awarded Summit $1,743,050 in punitive damages against Chubb. However, the jury also found that Summit willfully concealed or misrepresented material facts or circumstances relating to its policy claim, and that Chubb had not waived its right to assert this as a defense to its nonperformance of the insurance contract. The trial court concluded that "false swearing" constitutes a complete policy defense under Oklahoma law. Therefore, the trial court disregarded the jury's an-

swers except for its findings that Summit had made misrepresentations and that Chubb had not waived that defense, and rendered a take-nothing judgment in Chubb's favor.

Summit raises five issues on appeal. First, it argues that the evidence is factually and legally insufficient to support the jury's finding, in response to Question Four, that Summit breached the misrepresentation clause of the insurance policy. In its second and third issues, Summit asserts that Question Four was fatally defective "because it omitted the 'intent to deceive' element of the misrepresentation defense," and because "it was not limited to matters presented in the pleadings and evidence." Fourth, Summit urges that the evidence conclusively established that Chubb waived the misrepresentation defense, or in the alternative, that the jury's failure to find waiver was against the great weight and preponderance of the evidence. Finally, Summit argues that the trial court abused its discretion by excusing a juror for insufficient cause.

## DISCUSSION

### I. Sufficiency of the Evidence of Summit's False Swearing

In reviewing a no-evidence challenge, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *See Associated Indem. Corp. v. CAT Contracting,* 964 S.W.2d 276, 285–86 (Tex.1998). We will uphold the finding if more than a scintilla of evidence supports it. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 755 (Tex.1970); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *See Crye,* 907 S.W.2d at 499; *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994); *see also* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence"*

*and "Insufficient Evidence,"* 69 Tex. L.Rev. 515, 522 (1991). In reviewing a jury verdict to determine the factual sufficiency of the evidence, we consider and weigh all the evidence and set aside the judgment only if the evidence is factually so weak, or the verdict so contrary to the overwhelming weight of the evidence, as to make the judgment clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *King's Estate,* 244 S.W.2d at 661; *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986); *see generally* Powers & Ratliff, 69 Tex. L.Rev. 515.

We first consider Summit's argument that there is insufficient evidence to support the jury's affirmative answer to Question Four, which asked: "Did Summit, its employees or authorized agents, wilfully conceal or misrepresent any material fact or circumstance relating to Summit's claim under the Great Northern policy?" Summit argues that this case is a dispute about an honest difference in valuation, which does not permit the jury to consider false swearing under Oklahoma law. Chubb responds that the issue of false swearing was properly submitted to the jury upon sufficient evidence. We agree.

Oklahoma law recognizes false swearing as a complete policy defense. *See Long v. Insurance Co. of N. Am.,* 670 F.2d 930, 933 (10th Cir.1982); *Transportation Ins. Co. v. Hamilton,* 316 F.2d 294, 296 (10th Cir.1963); *Buffalo Ins. Co. v. Amyx,* 262 F.2d 898, 899 (10th Cir.1958); *Goodwin v. Maryland Cas. Co.,* 233 F.Supp. 81, 83 (E.D.Okla.1964); *Short v. Oklahoma Farmers Union Ins. Co.,* 619 P.2d 588, 590 (Okla.1980) (husband and wife joint insureds; false swearing defense applied against wife even though she did not know about or assist husband in committing arson); *Royal Ins. Co. v. Scritchfield,* 51 Okla. 523, 152 P. 97, 98 (1915); *Orient Ins. Co. v. Van Zandt–Bruce Drug Co.,* 50 Okla. 558, 151 P. 323, 325 (1915). Where an insured knowingly and willfully

overestimates the value of property destroyed or damaged, the policy is voided and the insured's right to recover is defeated. *See Hamilton,* 316 F.2d at 296. However, mere mistake, inadvertence, or a good-faith belief as to the value of insured property will not sustain a charge of false swearing. *See id.* (citing *Jose Rivera Soler & Co. v. United Firemen's Ins. Co.,* 299 U.S. 45, 50, 57 S.Ct. 54, 81 L.Ed. 30 (1936)). The falsity and materiality of the statement and the intent of the insured in making it are questions of fact for the jury. *See Hamilton,* 316 F.2d at 297; *Amyx,* 262 F.2d at 900; *Scritchfield,* 152 P. at 98; *Orient Ins. Co.,* 151 P. at 325.

▮▮▮ Summit submitted a sworn statement of loss claiming that the machinery had a value of $20,035,347.86 at the time of loss and that the "whole loss and damage" incurred was $16,674,694.16. The jury found the amount of Summit's loss to be $6,750,000. While this number is higher than the various estimates given by Chubb's experts, it is only approximately 40% of the amount Summit claimed. The wide discrepancy between the claimed damage to the machinery and the actual transit damage was a factual circumstance the jury was entitled to consider in deciding whether Summit swore falsely. *See Amyx,* 262 F.2d at 900–01. In this case, the jury found that Summit willfully concealed or misrepresented material facts or circumstances relating to its policy claim.

Summit argues that this case is about an "honest difference in opinion" and claims "[t]here was no evidence, either direct or circumstantial, from which the jury could properly infer that Summit intended to deceive Chubb in filing the Proof of Loss." We disagree for several reasons. As noted above, an extreme difference between value claimed and actual value can create an issue of fact on the insured's intention. Chubb presented overwhelming evidence that the machines had not been damaged nearly to the extent Summit claimed; the jury's finding of only $6,750,000 in transit damages is amply supported by the evidence. While Summit's witnesses testified that the sworn claim of more than $16 million in damages was based on the value of remanufactured machinery, numerous witnesses testified that the machines had never been remanufactured. Further evidence supports the jury's finding of willful misrepresentation.

### Golsen's and Shear's Testimony Regarding the Asemex Settlement

▮▮▮ The jury was entitled to disbelieve the testimony of Jack Golsen and David Shear, who claimed that the Asemex settlement was only for Summit's tort claims and not on its policy claim for transit damage. Likewise, it was entitled to believe that this testimony was given falsely in an attempt to trigger coverage under Chubb's secondary policy, since Chubb took the position that its coverage was not triggered if Asemex paid the $3.6 million for transit damage. Golsen's and Shear's testimony was contradicted by that of Summit's treasurer, Jim Jones, as well as by the language of the settlement agreement itself, in which Asemex paid $3.6 million in settlement of Summit's claim "for alleged damage to certain machinery and equipment." The jury was entitled to view Golsen's and Shear's misrepresentation as material because it was relevant to the existence and extent of coverage under Summit's secondary coverage with Chubb.

▮▮▮ Summit argues that Shear's testimony was not false because he simply gave his opinion about what motivated Asemex to settle. While Shear did make other statements of this nature, the jury was entitled to believe that these were in addition to his unequivocal testimony about the nature of the payment. Next, Summit argues that even if there is evidence that Shear was deceitful, his statements were solely about the legal effect of the settlement and are thus not actionable under Oklahoma law. We disagree; Shear stated *as a fact* that Summit was paid only on its tort claims and not on its transit claims. Finally, Summit argues that there is no evidence that Chubb was misled by Shear's statements because Chubb re-

ceived a copy of the proposed settlement before Shear testified in his deposition. However, it is not necessary that the insurance company actually be deceived by the false swearing to avoid the policy. *See Goodwin*, 233 F.Supp. at 84. We agree with the trial court's conclusion that Golsen's and Shear's testimony about the Asemex claim is evidence that supports the jury's finding of willful misrepresentation.

### Inflated Costs for Parts and Labor

■ There is further evidence supporting the jury's finding of willful concealment or misrepresentation. Summit admitted to a 100% markup on the parts used to repair equipment. Robert Matthews testified that Summit inflated its labor rates from an actual hourly average of $8.76 to a claimed rate of $150 per hour. Summit does not dispute these inflations, but argues that they were not dishonest in the context of Summit's attempt to make Chubb negotiate. We believe that these are precisely the sort of circumstances that a jury is entitled to consider in determining whether an insured made a willful misrepresentation. *See Scritchfield*, 152 P. at 98 ("whether such [proof of loss] statement was willfully made with intent to defraud is a question of fact to be determined by the jury under proper instructions, upon consideration of all the facts and circumstances in evidence surrounding the making of same."). Summit argued to the jury that it was cash-poor and simply trying to force Chubb to negotiate; by its answer to Question Four, the jury did not find these explanations to be legitimate excuses for Summit's misrepresentations. We cannot say the jury's decision in this regard was wrong, unjust, or unsupported by the evidence.

Summit repeatedly urges that there is no evidence that it made willful misrepresentations. It cites *Goodwin v. Maryland Casualty Co.*, 233 F.Supp. 81 (E.D.Okla. 1964), in support of its argument that inaccurate proof of loss does not show an intent to deceive under Oklahoma caselaw. In *Goodwin*, the insured claimed that the value of his house destroyed by fire was $30,000, the policy limit. *See id.* at 83. Although the trial court found the value of the house to be $15,000, it rejected the insurer's defense of false swearing. *See id.* at 85.

*Goodwin* is distinguishable for several reasons. First, in *Goodwin* there was expert testimony that the house was worth $34,000. The trial court thus attributed the fact that the value as claimed was only half of the value it determined to the normal disparity among expert opinions on real property values, rather than to fraudulent intent of the insured. *See id.* In the present case, the discrepancy in values, both in dollars and as a percentage, is larger than in *Goodwin*, and resulted not from competing expert valuations but from Summit's admitted attempt to "bring Chubb to the table." There was also evidence that Summit made other willful misrepresentations about the nature of the Asemex settlement and about its repair costs. But most importantly, in both cases the question of intent was one for the jury. The trier of fact in *Goodwin* was simply not persuaded that willful misrepresentation was shown by the evidence in that case; its failure to find false swearing, however, does not make the jury's affirmative finding in the present case erroneous as a matter of law.

We find *Amyx* and several other cases cited by Summit distinguishable for the same reason. In *Amyx*, the jury found the value of the insured's inventory destroyed by fire to be about half of the amount of the insured's sworn loss claim, and about four times what the insured's records showed. *See Amyx*, 262 F.2d at 900. There was testimony from a former employee that items reflected in the inventory were not on hand while he was employed there, and evidence that the insured's brother burned junk and added it to the debris after the fire to make the lost inventory appear greater than it was. *See id.* After the jury failed to find false swearing by the insured, the insurer appealed. The Tenth Circuit affirmed, con-

cluding: "In sum, there was evidence from which the jury might very well have concluded that the inventory was grossly exaggerated, and in fact materially and even fraudulently misrepresented. *But we think the issue was clearly one of fact for the jury.*" *Id.* (emphasis added). *See also Hamilton,* 316 F.2d at 297–98 (where insured claimed $29,277 loss and special master found loss of $21,286, special master's failure to find false swearing not clearly erroneous). *Amyx* and *Hamilton* provide little support for Summit's insufficiency argument.

Finally, we address Summit's argument that Chubb's evidence of false swearing is insufficient because the $16,674,694.16 claim was only an estimate designed to "bring Chubb to the table." To counter this proposition, Chubb cites *Lykos v. American Home Insurance Co.,* 609 F.2d 314 (7th Cir.1979), a case decided under Illinois law. In *Lykos,* the insured property was a restaurant owned by Lykos that was destroyed by arson. Lykos submitted a sworn statement of loss that was later shown to be grossly overvalued; Lykos did not consult his records or suppliers to determine values but based his estimate on memory, and it was uncontradicted that the values claimed for many items were inflated. After the jury returned a verdict in Lykos's favor, the trial court granted the insurer's motion for judgment n.o.v. on the ground that the insurer had established false swearing as a matter of law. *Id.* at 315–16.

The Seventh Circuit affirmed, writing:

> The plaintiffs attempt to dismiss some of the misrepresentations as mere estimates for purposes of negotiation, and they suggest that the exaggerated claims would have been ironed out had the insurance company been willing to negotiate. They contend that the evidence, therefore, does not establish the requisite intent to defraud. Even assuming that the plaintiffs did not intend to recover more than their actual losses and merely exaggerated the extent of loss with an eye to settling, we think the proper rule is that a design on the part

of the insured to gain a position of advantage in the settlement of the loss through false representations is a fraudulent design and the making of such representations knowingly for that purpose is an attempt to defraud ..., even though the insured may not have expected or intended ultimately to obtain more than compensation for the actual loss.

*Id.* at 316 (citing 14 *Couch on Insurance* 2d § 49:556 (1965)). Summit's argument is strikingly similar to the claim the Seventh Circuit rejected in *Lykos.* While Summit urges that *Lykos* is distinguishable because in that case (1) the evidence indicated that the insured set the fire, and (2) the evidence of overinflated values was uncontradicted, we do not find these to be meaningful distinctions. If anything, the present case is more persuasive because the jury found as a question of *fact* that Summit committed false swearing, whereas the Seventh Circuit in *Lykos* could only affirm the judgment n.o.v. for the insured if it agreed that Lykos had falsely sworn as a matter of *law.* Although *Lykos* was decided under Illinois law, we find nothing in the Oklahoma caselaw that compels a different result under the law of that state.

Given the discrepancy between the value of Summit's loss as claimed and its value as determined by the jury, plus the questionable testimony of Summit's officers that the Asemex settlement was only for tort claims, and the evidence that Summit grossly inflated its actual costs of parts and labor to repair the machinery, reasonable minds could conclude that Summit willfully made material misrepresentations pertaining to its insurance claim with the intent to defraud Chubb. Nor has Summit shown that the judgment was clearly wrong and unjust. We find the evidence of false swearing factually and legally sufficient and overrule Summit's first issue.

## II. Summit's Objections to Question Four

 Question Four asked: "Did Summit, its employees or authorized agents,

wilfully conceal or misrepresent any material fact or circumstance relating to Summit's claim under the Great Northern insurance policy?" In its second issue, Summit argues that Question Four was fatally defective because it did not contain an instruction that in order to answer "yes," the jury had to find that Summit intended to deceive Chubb. In its third issue, Summit urges that the question was defective because it was not limited to matters presented in the pleadings and evidence. Chubb responds that Summit waived both issues by failing to make a proper objection on each basis, and that in any event the question submitted was proper.

To preserve error, parties must make all objections to the jury charge before the charge is read to the jury; all objections not so presented are waived. *See* Tex.R. Civ. P. 272. An objecting party must point out distinctly the objectionable matter and the grounds of the objection. *See* Tex.R. Civ. P. 274. For an objection to be valid, the party must make the court aware of the complaint, timely and plainly, and obtain a ruling. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992). Summit's objections to Question Four were that (1) the question was general and not tied to any specific misrepresentation; (2) there was no evidence of concealment or misrepresentation; (3) there was no evidence that any misrepresentation was material; (4) Chubb had waived the policy defense; and (5) statements made in litigation should not be used to void policies. Because Summit's objections on appeal do not comport with any of the objections it raised at trial, Summit has waived the objections raised in its second and third issues. *See* Tex.R. Civ. P. 272, 274; *Payne*, 838 S.W.2d at 241.

Summit argues that even in the absence of an objection, the jury's answer cannot stand because it was not supported by sufficient evidence of intent. We have already addressed this contention and concluded that there is sufficient evidence in the record on which the jury could have found that Summit intentionally and wilfully misrepresented material facts with the intent to defraud Chubb. Summit's second and third issues are overruled.

## III. Waiver of the Misrepresentation Defense

In its fourth issue, Summit argues: "The evidence at trial conclusively established that Chubb waived the misrepresentation defense; alternatively, the great weight and preponderance of the evidence established this fact." The jury found that Chubb did not waive the misrepresentation defense. Summit argues that the jury's finding should be disregarded and that the judgment should be reversed and rendered in its favor.

Summit's argument is based on a March 31, 1993 message written by Frank Burans, the Chubb agent responsible for handling Summit's policy claim. In an e-mail message to his supervisor, Burans wrote:

> Don: Asemex still has not responded. Insured is considering suit. They are considering filing a Proof of Loss with us even though we have told them that we will have nothing to do with the claim and their claim has to be filed with Asemex. Have okayed assigning to Morris, Mahoney & Miller if and when proof is filed for interpretation and rejection of proof. Hold this open. We'll keep you posted. Frank.

Summit argues that Burans's e-mail message, along with testimony from Summit's expert on claims handling, conclusively establishes that Chubb made the decision to deny Summit's claim well before Summit filed its statement of loss and thus waived its policy defense.

Contrary to Summit's assertion, Burans's e-mail message does not state that Chubb was planning to deny any claim made by Summit; it only discusses the anticipated proof-of-loss statement. Burans testified that he instructed Summit's file to be held open, as the e-mail indicates. He also testified that when he wrote the

message, Chubb had received no substantiation of the claim. Because Summit was threatening to file a multi-million dollar lawsuit based on its claim, which involved complex issues and a lengthy factual history, Burans referred the claim to Chubb's attorneys for a coverage opinion. Burans explicitly denied that Chubb had decided to deny the claim at that point; instead, he was merely anticipating that the proof of loss would be rejected unless Summit substantiated its claims. Subsequent e-mail messages indicate that the file remained open for further consideration of the claim. We disagree that Summit conclusively established waiver or that the jury's finding was contrary to the great weight and preponderance of the evidence.

Chubb counters that Summit has confused denial of an insured's claim with rejection of its proof of loss. While the former may cause an insurer to waive policy defenses, Chubb urges, the latter does not. In *Great American Insurance Co. v. Harrington*,[4] the Oklahoma Supreme Court announced that state's rule about when an insurer waives its right to require compliance with policy requirements:

> Broadly stated, the rule is that, if the company denies liability for a loss, and refuses to pay it either for that or other reason, placing its refusal on a definite ground other than want of proofs of loss or a defect in their form or substance, it waives the right to insist on the failure to make requisite proofs as a defense to an action on the policy.

*Harrington*, 259 P. at 586; *see also Western Cas. & Sur. Co. v. Lund*, 132 F.Supp. 867, 870–71 (W.D.Okla.1955) (insurer's denial of liability constitutes waiver of insured's failure to give prompt notice of claim), *aff'd*, 234 F.2d 916 (10th Cir.1956); *Springfield Fire & Marine Ins. Co. v. Oliphant*, 150 Okla. 1, 300 P. 711, 712 (1931) (formal proof of loss waived when insurer denied liability under policy). Chubb argues that it never denied Summit's claim prior to litigation; Summit alleges that Chubb's actions constitute waiver of the misrepresentation defense. Both sides cite *Harrington* as primary authority for their position.

*Harrington* states that the insured waives its misrepresentation defense if it denies liability and refuses to pay its insured when its refusal is based "on a definite ground *other than want of proofs of loss or a defect in their form or substance* ...." *Harrington*, 259 P. at 586 (emphasis added). As Burans and other witnesses testified, Chubb did not deny Summit's claim; it merely rejected the statement of loss because it lacked adequate substantiation. Under the facts the jury evidently chose to believe, this situation falls under the waiver exception noted in *Harrington* rather than the general rule. We have reviewed the evidence and reject Summit's argument that either waiver was conclusively established or the jury's failure to find waiver was against the great weight and preponderance of the evidence. We overrule Summit's fourth issue.

## IV. Dismissal of Juror Wygant

Summit's fifth and final issue on appeal complains that the trial court erred in dismissing juror Sherry Wygant when her son was hospitalized with a serious illness. On the morning of September 16, 1997, the trial judge made the following announcement:

> [T]he jury in this case was deliberating when juror Sherry Wygant received notice that her son was ill and was being taken to the hospital. She was excused by the Court to go to the hospital. She has since called in and said that her son seems to be seriously ill and vomiting blood and that she would not be able to return today and didn't know if she could come tomorrow or not.
>
> For that reason the Court instructed the jurors to proceed with 11 jurors and we'll dismiss Ms. Wygant when she calls today or tomorrow.

When the court asked if the plaintiff had any objections, Otto Good, counsel for

4. 127 Okla. 13, 259 P. 582 (1927).

Summit, stated: "Yeah for the record, Your Honor. Officially I object." Defense counsel then made a lengthy and substantial objection. The judge stated that another juror would be leaving on vacation the next day. At that point, the bailiff apparently spoke to the members of the jury and found out that some jurors would be willing to continue deliberations that evening but had to attend to various personal situations first. When the judge asked plaintiff's counsel if he had any suggestions, Good replied: "Not anything good, Judge. Again, if I knew we could agree to go on with ten jurors, that's—if that solves the problem." Defense counsel refused this suggestion. The judge then called in the eleven-member jury and asked them to continue deliberating that evening after a recess, which they agreed to do.

■ While the jury was deliberating later that evening, the trial judge announced:

Earlier today I made a statement concerning a juror, Ms. Wygant, who left to go to the hospital because her son was going to the hospital. And I did not mention it, but it is clear that she was sobbing when she left and did not appear to be able to continue to play any part in the deliberations. That's all.

Summit argues that the trial court abused its discretion in dismissing juror Wygant "because a sitting juror may only be excused for actual physical or mental incapacity." Chubb responds that Summit waived any objection to Wygant's dismissal because it did not obtain a ruling on its objection, see Tex.R.App. P. 33.1(a), or because plaintiff's counsel stated that Summit did not want a mistrial and suggested that deliberations proceed with fewer than twelve jurors.

We first consider Chubb's waiver argument. It is clear from the record that the trial judge had already excused juror Wygant and determined that she would be dismissed when he asked if counsel for either side had any objections. Appellate

Rule 33.1 states that error is preserved if the trial court implicitly overrules a party's objection. Tex.R.App. P. 33.1(a)(2)(A). We do not believe that Summit was required to obtain a ruling on its objection when the circumstances clearly indicated that the trial court's decision was already made and the judge was apparently soliciting objections "for the record." And although Summit's objection was voiced with less vigor than the objection made by defense counsel, Chubb cites no authority for the proposition that Summit's failure to request a mistrial renders its objection ineffective. We will address the merits of Summit's fifth issue.

■ The Texas Constitution and the Texas Rules of Civil Procedure require a district-court jury to consist of twelve original jurors, but as few as nine may return a verdict if the others die or become "disabled from sitting." Tex. Const. art. V, § 13; Tex.R. Civ. P. 292. The supreme court has equated being "disabled from sitting" with "an actual physical or mental capacity." *See McDaniel v. Yarbrough,* 898 S.W.2d 251, 253 (Tex.1995) (citing *Houston & Tex. Cent. Ry. Co. v. Waller,* 56 Tex. 331, 337–38 (1882)). Not just any inconvenience or delay is a disability. *See Yanes v. Sowards,* 42 Tex. Sup.Ct. J. 570 (Tex. Apr. 22, 1999). However, trial courts have broad discretion in determining whether a juror is "disabled from sitting." *See McDaniel,* 898 S.W.2d at 253. Thus, the test is whether the trial court acted without reference to guiding rules and principles or whether the act was arbitrary and unreasonable. *See id.*

In *Waller,* juror Thomas Bradbury's wife informed him by letter that one of their children was sick and asked him "to come home *if he could." Waller,* 56 Tex. at 337 (emphasis added). After reading the letter, the trial court asked Bradbury if the letter "satisfied him that it was necessary for him to be at home to attend his sick child"; Bradbury answered that it did. *Id.* Over the objection of defense counsel the trial court dismissed Bradbury and continued the trial with the remaining

eleven jurors. The supreme court reversed, stating:

> [W]ithout deeming it proper to attempt to define fully the meaning of the expression used in the constitution, we are satisfied that the causes which disable the juror from sitting, and justify the extreme course of allowing, over a party's objection, a verdict to be rendered by the remainder of the jury, must be of a nature more directly showing his physical or mental incapacity than mere mental distress occasioned by the sickness of others, and the feeling that duty to the sick demanded his presence elsewhere. Extreme cases of the kind, however strongly they may appear to the court to release the juror, do not belong to the class provided for by the constitution or statute.

*Id.* at 337–38.

The supreme court recently distinguished *Waller* in *Yanes v. Sowards,* 42 Tex. Sup.Ct. J. 570, 996 S.W.2d 849 (Tex. 1999). In that case, during the second day of testimony juror Christopher Obregon notified the trial court that his grandfather was in the hospital dying from an E-coli infection. In response to questioning from the court, Obregon stated that the situation would interfere with his ability to listen to and understand the trial evidence and that he did not think he could pay attention. Based on Obregon's answers, the trial court found that Obregon was disabled under Rule 292 and dismissed him. The case proceeded with the remaining eleven jurors, who found unanimously for the defendant Yanes. *See id.* at 570–71, 996 S.W.2d at 849–51.

The court of appeals reversed, holding that under *Waller,* an illness in a juror's family is not a sufficient constitutional disqualification. *See Sowards v. Yanes,* 955 S.W.2d 456, 459 (Tex.App.—Fort Worth 1997). Summit relied on the court of appeals' opinion in its appellant's brief and

reply brief filed in this Court, arguing that the trial court in the present case erred for the same reason. While the present appeal was pending, however, the supreme court granted Yanes' petition for certiorari and reversed. *See Yanes,* 42 Tex. Sup.Ct. J. at 572, 996 S.W.2d at 851–53.

In a per curiam opinion, the supreme court distinguished *Waller* on the ground that there was no evidence in that case that juror Bradbury's mental distress would prevent him from discharging his duties as a juror. In *Yanes,* however, juror Obregon testified that he would be distracted and unable to pay attention due to his grandfather's condition. The court held that the trial court's finding of disability was supported by Obregon's testimony showing that he was emotionally and psychologically disabled from sitting. *See id.*

■■■ In post-submission briefing, Summit now seeks to distinguish *Yanes* on the ground that the trial court's dismissal of juror Wygant "was entirely unsupported by any record evidence." While it is true that the testimony of Ms. Wygant herself is not in the record, the trial court stated on the record that she was sobbing when she was excused to attend to her son at the hospital. She later telephoned the court to report that he was "seriously ill and vomiting blood." We think the trial court properly exercised its discretion by ordering the dismissal of juror Wygant without requiring her to abandon her son at the hospital and return to the courthouse to repeat what the trial judge had already stated to the parties on the record. The record adequately supports the trial court's conclusion that juror Wygant was "disabled from sitting" because she was "sobbing when she left and did not appear to be able to continue to play any part in the deliberations." The evidence of her disability is at least as strong as that of juror Obregon in *Yanes.* Under *Yanes* and other Texas authority,[5] no abuse of

---

**5.** *See Southern Pac. Transp. Co. v. Peralez,* 546 S.W.2d 88, 97 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.) (no abuse of discretion in discharging juror who became disturbed

and unable to serve as a juror because of family member's illness); *Schebesta v. Stewart,* 37 S.W.2d 781, 783 (Tex.Civ.App.—Fort Worth 1930, writ dism'd w.o.j.) (juror advised

discretion has been shown. Summit's fifth point of error is overruled.

## CONCLUSION

The evidence is factually and legally sufficient to support the jury's finding that Summit made material misrepresentations of fact pertaining to its insurance policy with Chubb. Summit did not conclusively establish that Chubb waived its "false swearing" defense, and the jury's failure to so find was not contrary to the great weight of the evidence. Finally, Summit's claims of error in the jury charge and in the dismissal of juror Wygant are without merit. We therefore affirm the trial-court judgment.

to "come at once if he wished to see his father alive" was "physically ill, trembling, eyes and nose running, pulling his hair, his voice hoarse, and thereby rendered physically unable to sit further as a juror"); *Barker v. Ash,* 194 S.W. 465, 466–67 (Tex.Civ.App.—Dallas 1917, writ ref'd) (news that juror's child dangerously ill and about to die sufficient to disable juror from fair consideration of case); *see also Allen v. State,* 867 S.W.2d 427, 429–30 (Tex.App.—Beaumont 1993, no pet.) (juror whose aunt and brother-in-law both died within twenty-four hour period found emotionally disabled); *Wells v. State,* 762 S.W.2d 673, 674–75 (Tex.App.—Texarkana 1988, pet. ref'd) (juror who suffered death in family found too distraught to continue); *Mills v. State,* 747 S.W.2d 818, 819–20 (Tex.App.—Dallas 1987, no pet.) (juror whose grandfather died and who testified he could not keep his mind on case found emotionally disabled).