TEXAS INSTRUMENTS,
INCORPORATED,
Petitioner,

v.

TELETRON ENERGY MANAGEMENT,
INC., Respondent.

No. D–3088.

Supreme Court of Texas.

Argued Oct. 12, 1993.

Decided April 20, 1994.

Rehearing Overruled June 2, 1994.

Franci N. Crane, Jesse R. Pierce, Warren W. Harris, Houston, for petitioner.

Andrew R. Harvin, James E. Doyle, Houston, for respondent.

HECHT, Justice, delivered the opinion of the Court, in which all Justices join.

Two principal questions are presented in this case. One is whether the statement of facts was timely filed; we agree with the court of appeals that it was. The other is whether lost profits were proved with sufficient certainty to allow recovery; we conclude, as the trial court did and contrary to the court of appeals, that they were not. We reverse the judgment of the court of appeals, 838 S.W.2d 305 and affirm the judgment of the district court.

## I

Samir Soliman, an engineer by education and experience, incorporated Teletron Energy Management, Inc. for the purpose of developing and marketing a new, unique, voice-prompted, programmable thermostat called the T-2000, for residential and light commercial use. There was no comparable device on the market, and Soliman contacted several possible manufacturers about designing and producing the necessary state-of-the-art microprocessor, software and hardware. Soliman eventually settled on Texas Instruments, which, after some negotiations, contracted to build ten working prototypes of the T-2000 according to Teletron's specifications within eleven weeks for $32,200. Teletron paid TI $15,000 initially and proceeded to advertise the product and set up distributorships to market it. Despite repeated promises, apologies, and reassurances, TI was never able to produce a unit which worked properly, and after nearly two years of failure, it gave up trying.

Teletron sued TI for breach of contract, breach of warranty, violations of the Texas Deceptive Trade Practices—Consumer Protection Act, negligence, breach of fiduciary duty, and fraud. Teletron claimed damages of more than $1.3 million in expenses incurred in promoting the T-2000, $14 million in past lost profits, and $54 million in future lost profits. The jury found that TI had breached express warranties made to Teletron and had knowingly violated the DTPA in several particulars.[1] The jury determined Teletron's damages to be $100,000 for expenses, $500,000 for past lost profits, and $0 for future lost profits. The trial court rendered judgment for Teletron for the $100,000 in expenses, $200,000 in additional damages under the DTPA, and $825,000 attorney fees, but refused to award Teletron the $500,000 lost profits found by the jury, granting TI's motion for judgment non obstante veredicto as to this finding. Only Teletron appealed. The court of appeals modified the judgment to include the $500,000 for lost profits. 838 S.W.2d 305.

## II

We first consider TI's contention that the statement of facts was not timely filed in the court of appeals and therefore should not be considered.

The court reporter, Jacquelyn Miles, did not complete the statement of facts for more than a year after it was originally due. Teletron filed nine timely motions to extend the due date, none of which TI opposed and all of which the court of appeals granted. The deadline set by the court in response to the last motion was December 2, 1991. Teletron also petitioned the court for mandamus relief, which the court granted, ordering Miles to file the statement of facts. When Miles did not comply, the court held her in contempt and issued a writ of attachment, directing the constable to arrest her and produce her for hearing on December 18, 1991. After much difficulty, the constable found Miles and placed her in jail until she could post bond for her release. Teletron immediately filed an emergency request in the mandamus proceeding that Miles' bond be raised or that she be held without bond. The court did not grant this request, but in response, postponed the December 2 deadline for filing

---

1. The jury also found that Teletron's damages were caused 65% by TI's negligence and 35% by Teletron's own negligence. The jury failed to find many of the DTPA violations asserted by Teletron, or fraud or gross negligence.

the statement of facts, which had not yet passed, until December 18, to coincide with the date set for Miles' appearance in the mandamus proceeding. 838 S.W.2d at 307. The court stated that it took this action "on its own motion", and that "[d]ue to a clerical error", the order of extension was issued under the caption and number of the mandamus proceeding rather than the appeal. *Id.* The statement of facts was filed on December 6.

TI argues that the appellate court's extension of the December 2 deadline was ineffective for two reasons. First, TI argues that the deadline for filing a statement of facts can be extended only on the motion of a party and not on the court's own motion. We have held that a court cannot grant an untimely motion to extend the time for filing the appellate record. *Chojnacki v. First Court of Appeals,* 699 S.W.2d 193 (Tex.1985); *B.D. Click Co. v. Safari Drilling Corp.,* 638 S.W.2d 860 (Tex.1982). We have also held that a court cannot accept the record after the time for filing it and the time for filing a motion for extension have both expired. *Meshwert v. Meshwert,* 549 S.W.2d 383, 384 (Tex.1977). We have not, however, addressed the specific issue raised by TI, which is whether, before a properly granted extension for filing the record has expired, a court can further postpone the deadline on its own motion. We hold that it can. In granting a timely filed motion for extension, the court has discretion to set a new deadline. It would make little sense to allow the court discretion in setting the deadline, but none in adjusting it once it was set and before it expired. As this case illustrates, the court of appeals must have sufficient control of its own proceedings to alter scheduled deadlines to facilitate its work. The court here, having granted a timely motion and set a date for filing the statement of facts, chose to postpone the extended deadline before it expired so that the statement of facts would be due the same day the court reporter was to appear before the court. This postponement was not necessary; the court might have decided to leave the filing deadline where it

was. But it was certainly within the court's discretion to move that deadline if the court, for whatever reason, wanted it to coincide with the appearance date.[2]

TI's second argument is that the extension of the December 2 deadline was ordered in the wrong proceeding, the original mandamus proceeding rather than the appeal. Again, we have never addressed this specific issue. In *Philbrook v. Berry,* 683 S.W.2d 378 (Tex.1985) (per curiam), we held that a motion for new trial filed in a case did not extend the trial court's plenary power to set aside a judgment severed from that case. However, in *City of San Antonio v. Rodriguez,* 828 S.W.2d 417 (Tex.1992) (per curiam), we questioned whether *Philbrook* was correctly decided and held that a notice of appeal was effective even though it bore the wrong case number when there was no suggestion of confusion. We reiterated that "the decisions of the courts of appeals [should] turn on substance rather than procedural technicality." *Id.* at 418 (citing *Crown Life Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121 (Tex.1991) (per curiam)). In the present case, the misfiling of the court's order was, according to the court, due to clerical error. TI could not have been confused; there was no statement of facts to be filed in the mandamus proceeding. The purpose of the mandamus proceeding was to compel the filing of the statement of facts in the separate appellate proceeding. The clerk's error did not render the court's order ineffective.

Accordingly, we conclude that the statement of facts was timely filed and properly considered by the court of appeals.

### III

We next consider TI's contention that Teletron is not entitled to recover damages for lost profits because they were not proved with reasonable certainty.

We stated the rule for recovery of lost profits in *Southwest Battery Corp. v. Owen,*

---

2. We do not address whether a court of appeals may extend the filing deadline in the complete absence of a timely filed motion to extend; nor

do we address whether a court can grant an extension, without motion, after a previously extended deadline has expired.

131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938):

> The various legal encyclopaedias and textbooks lay down certain rules applicable to an action for damages for loss of profits. [T]he rule is stated in the following language: "The generally accepted rule is that, where it is shown that a loss of profits is the natural and probable consequences of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor; but anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated. So evidence to establish profits must not be uncertain or speculative. It is not necessary that profits should be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness." (citation omitted).

> The rule as announced by the decisions of the courts of this state is summarized ... as follows: "In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such preexisting profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions." (citation omitted).

> In the early decisions a rigid rule affecting the right of recovery for lost profits was announced. Modern business methods have caused a relaxation of that hard rule. (citations omitted).

> The rule denying a recovery where the facts show that such profits claimed are too uncertain or speculative, or where the enterprise is new or unestablished, is still enforced, on the ground that the profits which might have been made from such businesses are not susceptible of being established by proof to that degree of certainty which the law demands. (citations omitted).

We have consistently reaffirmed the *Southwest Battery* decision. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80 (Tex.1992); *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260 (Tex.1983); *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955); *Whiteside v. Trentman*, 141 Tex. 46, 170 S.W.2d 195 (1943).

*Southwest Battery* did not simply replace an old "rigid rule" with a new one. The requirement of "reasonable certainty" in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise. As we said then: "In a case of this kind the real difficulty lies not so much in the statement of the rules as it does in the application of the correct rule." 115 S.W.2d at 1099. Five years later we wrote: "Profits are not always speculative and remote. Whether in a given case they should be so classified depends altogether upon the facts and circumstances of that particular case." *Whiteside*, 170 S.W.2d at 197. More recently we reiterated: "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton*, 835 S.W.2d at 84.

This does not mean, however, that the "reasonable certainty" test lacks clear parameters. Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

■ The fact that a business is new is but one consideration in applying the "reasonable certainty" test. In *Southwest Battery* the Court endorsed enforcement of a rule denying recovery of lost profits "where the enterprise is new or unestablished". 115 S.W.2d at 1099. But this rule does not deny recovery by a new business simply because it is new; it denies recovery "on the ground that the profits which might have been made from such businesses are not susceptible of being established by proof to that degree of certainty which the law demands." *Id.* The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits. When there are firmer reasons to expect a business to yield a profit, the enterprise is not prohibited from recovering merely because it is new.

■ The "enterprise" referred to in *Southwest Battery* is not the business *entity*, but the *activity* which is alleged to have been damaged. This distinction is important. For example, if lost profits were recoverable for damage to a business activity of the XYZ Corporation, they should not be denied simply because the activity was conducted by a subsidiary newly formed for that purpose which XYZ controlled and managed. The focus is on the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market.

The circumstances in *Southwest Battery* illustrate the proper application of the legal rule. Although the partnership alleged to have been damaged in that case appears to have been newly formed to sell automobile batteries on consignment from Southwest Battery, it demonstrated during the few months in which it actually operated under this arrangement an ability to sell all the batteries Southwest Battery was obliged to supply. More importantly, the Court noted:

> The automobile industry has taken a dominant place in business affairs. The method of conducting its business is thorough and well established. In order to meet the demands of the trade, many agents selling the various parts of automobiles are selected. *The selling of batteries used in auto-*

*mobiles is not an uncertain or speculative business.*

115 S.W.2d at 1099 (emphasis added). The partnership claimed lost profits for sale of the batteries Southwest Battery failed, in violation of its contract, to supply. The evidence showed that the partnership would have been able, in all likelihood, to sell the additional batteries at the profit claimed.

Similarly, *Pace* involved a claim of lost profits by a business which, although new, had been operating successfully at the time the claim arose and continued to do so afterward. The business involved selling cigarettes at wholesale and through vending machines. The owner, Jackson, had many years' experience selling cigarettes through vending machines, and successfully sold them at wholesale in his new venture. The business contracted to buy cigarettes from Pace at a cost lower than wholesale, and filed suit when Pace refused to honor the agreement. Although the extent of Jackson's probable success, but for the breach, was disputed, the fact of his success was not in doubt. *Pace*, 284 S.W.2d at 348–49.

■ The contrast between *Southwest Battery* and *Pace* on the one hand, and the present case on the other, is quite sharp. Those cases involved the sale of established products—car batteries and cigarettes; the present case involves the proposed sale of a new and unique product which had never been sold before. In our former cases, the products were in existence, and the damages resulted from failure of delivery; in the present case, a working model of the T–2000 never existed. Indeed, there is no evidence that a thermostat like the T–2000 has ever been produced and sold by anyone. The very viability of the product is in doubt in this case. The businesses in the former cases actually operated at a profit, albeit for a short time; Teletron never did. Teletron's expectations were at best hopeful; in reality, they were little more than wishful.

Teletron strenuously argues that even TI thought its projections were reasonable. The fact that TI shared Teletron's hopes adds no substance to them. If anything, the circumstances of TI's failure to perform its

agreement demonstrate that Teletron's business was a gamble. Had TI performed, it stood to profit from Teletron's success; in any event, it would have avoided liability to Teletron for damages. TI's inability to produce a working model of the T–2000, despite the strong positive incentive of profit and the stronger negative incentive of avoiding very substantial liability, indicates that Teletron's proposed business was not feasible. Teletron's evidence that a strong market existed for its unique thermostat at a moderate price is beside the point; no such product ever existed.

In sum, there is no evidence in this case to prove with reasonable certainty what profits Teletron lost on account of TI's failure to perform its contract. The trial court properly refused to award such profits to Teletron.

\*　　\*　　\*　　\*　　\*　　\*

Accordingly, the judgment of the court of appeals is reversed, and the judgment of the trial court is affirmed.