TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00352-CV






Power Computing Corporation, Appellant



v.



Second Wave, Inc., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 96-09239, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING 







 Second Wave, Inc. ("Second Wave") sued appellant Power Computing Corporation
("Power") for breach of contract, fraud, negligent misrepresentation, and violation of the
Deceptive Trade Practices Act ("DTPA"). A jury found in favor of Second Wave on each of its
causes of action and assessed actual damages of $510,000.00. (1) We affirm the district court
judgment.


BACKGROUND

 Second Wave manufactures products that enable multiple peripheral computer
devices, such as scanners and printers, to be connected to a single expansion slot on Apple
Computer Corporation ("Apple") computers. In late 1994, Apple approached Second Wave to
design an expansion chassis to be marketed with Apple's 1995 product line. Apple planned to
discontinue use of "NuBus" slot technology in favor of "PCI" slot technology and wanted an
inexpensive expansion chassis that would give purchasers of new PCI computers the option of
continuing to use NuBus peripherals. Apple was concerned that the change from NuBus slot
technology to PCI slot technology would upset members of its customer base who had a
substantial investment in NuBus-based peripherals.

 Apple offered to provide Second Wave free marketing support as long as Second
Wave's chassis was available for commercial sale by June 1995, the date of Apple's new product
launch. Second Wave designed a product that made it possible to connect NuBus-based peripheral
devices to PCI slots but at a higher cost than Apple wanted. Most of the cost of producing the
chassis was due to the need to use multiple chips to produce the desired function. Second Wave
suggested that if a single Application Specific Integrated Circuit chip ("ASIC") could be
developed that would duplicate the function of the multiple chips, the cost of the expansion chassis
could be greatly reduced. Apple expressed an interest in funding such a project and instructed
Second Wave to seek quotes from chip manufacturers. Second Wave contacted several chip
manufacturers and secured a bid from a company called Sigmatel.

 In December 1994, Apple informed Second Wave that it had selected Power to
design and manufacture the ASIC, subsequently named "Stargate." The ASIC design,
development, and purchase agreement between Power and Apple, effective April 12, 1995,
included a specific production schedule to ensure delivery by June 1995. The agreement also
prohibited Power from selling the chip to anyone other than Apple and Apple's designated buyers. 
Second Wave is not mentioned in the agreement.

 In January 1995, Second Wave met with Power and Apple to discuss Second
Wave's participation in the development of the Stargate chip. Second Wave offered to provide
Power with access to Second Wave's preliminary ASIC design in exchange for a five-dollar
royalty for each chip produced. Power tentatively accepted the offer but shortly thereafter
rejected the offer of assistance and decided to design the entire chip itself. Roger Storer, vice
president of Second Wave, testified that Power agreed to make production quantities of the
Stargate chip available for sale to Second Wave at cost by June 1995; however, there was no
signed agreement between Power and Second Wave.

 Power engineers provided Second Wave with information regarding the status of
Stargate throughout the design and production phases of the chip. Most of the communications
took place between Storer and Power's product manager in charge of the Stargate project, Steve
Winegarden. Power requested Second Wave's chip requirements, assuring Second Wave that the
Stargate chip would be made according to Second Wave's specifications. Power also shipped the
Stargate prototype chip to Second Wave for testing and included Second Wave's vendor
identification information in the chip.

 Throughout April and May 1995, Power repeatedly updated Second Wave on the
production schedule and assured Second Wave that production was on schedule for a June 1995
delivery date. But in June, production quantities of the chip were not available. Second Wave
began selling the more expensive version of its expansion chassis at the Stargate expansion chassis
price in order to comply with the price Second Wave had previously submitted to Apple to be
included in Apple's marketing materials.

 Production of the Stargate chip was not completed until March 1996. The parties
disagree as to the cause of the delay. Former Power employee Peter Mehring testified that the
Stargate design project was significantly understaffed when he left the company in January 1995. 
Mehring also testified that it was impossible to design and produce an ASIC chip similar to
Stargate in the six-month time period specified in the Power-Apple agreement. Second Wave's
ASIC design expert, William Bruckert, agreed that Power did not have sufficient staff to design
and produce the Stargate chip in six months.

 Bob David Nuckolls, a Power chip designer on the Stargate project, testified that
the failure to meet the June 1995 deadline was due in part to Power's shortage of chip-testing
boards and to delays by the manufacturer of the chip, Toshiba. It is uncontested that during the
latter part of 1995 there was a worldwide shortage of silicon wafers used in manufacturing
computer chips. Nuckolls also stated that he had been concerned that designing and producing
Stargate in six months might not be possible with the size of the staff employed by Power. 
Winegarden testified that the delays in production were caused both by changes Apple made in
the design and Toshiba manufacturing delays. William Hun Lon Fong, Toshiba's customer
representative on the Stargate project, testified that an unusually high number of design errors in
the Stargate chip design contributed to delays in production.

 When the Stargate chip was finally completed, it was incompatible with Apple's
Macintosh 601 power PC processor, which was used in a series of Macintosh computers sold by
Apple in late 1995. Apple accepted delivery of the Stargate chip but refused final payment
because the chip was not delivered before the June 1995 deadline. The chip was never
incorporated into any Apple or Power products for sale. Production quantities of the Stargate chip
were never made available to Second Wave, and Second Wave sued Power.

 The jury awarded actual damages of $510,000 to Second Wave on each of its four
causes of action, as well as attorney's fees. Second Wave filed a motion for judgment on the
verdict requesting that the trial court award actual damages under Second Wave's breach of
contract claim or, alternatively, for violations of the DTPA. The final judgment incorporated the
jury's findings for all purposes and awarded Second Wave $510,000 in actual damages.

 Of the six issues raised by Power on appeal, two relate to Second Wave's breach
of contract claim. Power first argues that the district court erred in submitting a jury question and
in rendering judgment on Second Wave's contract claim because there was no evidence or,
alternatively, insufficient evidence of a contract between Second Wave and Power. Power also
contends that there was no evidence or, alternatively, insufficient evidence of lost profits damage
to Second Wave.

 Power's remaining four issues concern Second Wave's tort claims. Power argues
that the district court erred by failing to segregate contract and non-contract damages in the jury
charge. Power argues next that there was no evidence of misrepresentation of an existing fact
resulting in damages to Second Wave. Power also contends that there was no evidence or,
alternatively, insufficient evidence of any tort or DTPA violation apart from breach of contract. 
Finally, Power argues that the district court erred in refusing to submit Power's requested jury
issue on comparative responsibility.


DISCUSSION

 We will first consider the breach of contract issues. The jury was presented with
three questions concerning Second Wave's contract claim. In question number four, the jury was
asked, "Did Second Wave, Inc. and Power Computing Corporation agree that Power Computing
would design and manufacture ASICs for Second Wave's NuBus/PCI bridge product and provide
them to Second Wave at Power Computing's cost before or during June 1995?" The jury
answered the question affirmatively. Question number five asked, "Did Power Computing
Corporation fail to comply with the agreement?" The jury again answered affirmatively. In
response to question number eleven, which asked what sum of money would fairly and reasonably
compensate Second Wave for damages resulting from Power's failure to comply, the jury awarded
Second Wave $510,000.

 In its sixth issue, Power contends that the district court erred in submitting question
number four to the jury and in rendering judgment based on the jury's affirmative response
because there was no evidence or, alternatively, insufficient evidence of a binding agreement
between Second Wave and Power. Specifically, Power argues that there was no evidence that
Power committed to sell and Second Wave committed to purchase any Stargate chips by June 1995
because essential terms such as price, quantity, product specifications, and delivery date were too
indefinite to be legally enforceable.

 Whether parties intended to enter into a binding contract is generally a question of
fact. See Farah v. Mafrige & Kormanik, P.C., 927 S.W.2d 663, 678 (Tex. App.--Houston [1st
Dist.] 1996, no writ). Whether a particular agreement is an enforceable contract, however, is a
question of law. See id. A contract is not enforceable unless the parties' legal obligations and
liabilities can be determined. See T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218,
221 (Tex. 1992). The material terms must be agreed upon before the contract is enforceable. See
id. The agreement must be "sufficiently definite in its terms so that a court can understand what
the promisor undertook." Id. A contract will fail for indefiniteness if evidence is not presented
on all essential terms. See id. at 221-22.

 Texas Rule of Civil Procedure 278 provides, "The court shall submit the questions,
instructions and definitions in the form provided by Rule 277, which are raised by the written
pleadings and the evidence." Tex. R. Civ. P. 278. A trial court may refuse to submit a relevant
issue only if no evidence exists to support it. See Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex.
1992); Garza v. Alviar, 395 S.W.2d 821, 824 (Tex. 1965). When the evidence offered to support
an issue is so weak as to do no more than create a mere surmise or suspicion of its existence, the
evidence is no more than a scintilla and is, in legal effect, no evidence. See Kindred v.
Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). If there is more than a scintilla of probative
evidence in the record to support the issue, a no evidence challenge fails. See Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996).

 The test for the application of the no evidence rule is that if reasonable minds
cannot differ from the conclusion that the evidence offered to support the existence of a vital fact
lacks probative force, it will be held to be the legal equivalent of no evidence. See Kindred, 650 
S.W.2d at 63. However, if there is some evidence, more than a scintilla, the evidence furnishes
some reasonable basis for differing conclusions by reasonable minds as to the existence of the vital
fact. See Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); see also Brown
v. Goldstein, 685 S.W.2d 640, 641-42 (Tex. 1985) (where evidence is conflicting, it is error to
refuse submission of issue). The same test is applied to determine whether a jury finding is
supported by legally sufficient evidence. See Summit Mach. Tool Mfg. Corp. v. Great N. Ins.
Co., 997 S.W.2d 840, 845 (Tex. App.--Austin 1999, no pet.).

 In order to determine if question four should have been presented to the jury and
whether legally sufficient evidence supports the jury's affirmative finding, we first must examine
the record to see if there is some evidence of an agreement that Power would design and
manufacture Stargate chips and provide the chips at cost to Second Wave by June 1995. We
consider all the evidence in the light most favorable to the issue's submission and the finding,
indulging every reasonable inference in favor of both. See Associated Indem. Corp. v. CAT
Contracting, 964 S.W.2d 276, 285-86 (Tex. 1998) (citing Harbin v. Seale, 461 S.W.2d 591, 592
(Tex. 1970)).

 Roger Storer of Second Wave testified that he first became aware that Apple had
selected Power to design and manufacture Stargate in December 1994. Initially, Storer believed
that Power was designing the chip solely for use by Second Wave; however, in January 1995,
Carl Hewitt of Power informed Storer that Power was developing Stargate both for Second
Wave's use and for use in Apple computer clones being manufactured by Power. At a meeting
in San Francisco during the first week in January 1995 attended by representatives of Second
Wave, Power, and Apple, Second Wave agreed to license its existing multiple-chip technology
to Power for $5 per chip. Storer testified that Power initially agreed, but within a day or two,
Power decided to design Stargate from scratch and sell the finished product to Second Wave.

 At Power's request, Second Wave provided a list of chip specifications so that
Power could incorporate them into its Stargate design. On January 25, 1995, Storer sent an e-mail to Hewitt and Peter Mehring in which he detailed eight chip specifications; Hewitt responded
with an e-mail stating, "We'll take a look at your requirements and get in touch soon."

 Storer testified that during January and February 1995, Power assured Second
Wave that the Stargate chip would be available in sample quantities in April 1995 and in
production quantities in June 1995, the date of Apple's new product launch. Storer testified that
Second Wave, Apple, and Power all appreciated the importance of marketing a NuBus-to-PCI
bridge product utilizing the Stargate chip by June 1995 in order to fully capture demand, which
would greatly diminish as more Apple customers switched from NuBus to PCI-based machines. 
Storer also testified that Power represented Stargate would be manufactured for approximately $20
per chip and that Power and Apple confirmed that Second Wave would be allowed to purchase
the chips at cost.

 Power sent the Stargate preliminary specifications to Second Wave on February 8,
1995. The specifications note that the Stargate chip will contain device and vendor identification
information that, depending upon how the chip is configured, will identify the chip as a product
of either Power or Second Wave. A February 21, 1995 e-mail from Power employee Steve
Winegarden to Storer requests additional technical information related to Second Wave's chip
requirements, as well as Second Wave's vendor identification number. Storer e-mailed Hewitt
on the same day. Storer's e-mail refers to a prior phone conversation between Storer and Hewitt,
mentions two technical concerns of Second Wave, and concludes "[a]ll other items that we
discussed sounded like you had an understanding of our requirements. When can we expect to
receive the final chip spec?"

 On April 18, 1995, Storer sent Winegarden an e-mail in which he inquired about
the status of Stargate. Winegarden responded on April 21. Winegarden's e-mail states, "We will
be ready to go to the Si [silicon] vendor within two weeks . . . . Can you provide us with your
vendor and device IDs? Is there anything else we can do to assist you?" Winegarden wrote
Storer again on May 2, stating, "We plan to be at out [sic] Si vendor this Friday, and to have
chips before month end if all goes well." On May 17, Winegarden wrote Storer to inform him
that Power was working with its silicon vendor and had placed Second Wave's vendor
identification information on the chip. On June 9, Hewitt wrote both Second Wave and Apple,
informing them that the chip would be sent to Second Wave on approximately July 7.

 Second Wave finally received ten sample chips in mid-August 1995, but the chips
did not function properly. In October 1995, Second Wave sent Power a purchase order for 500
chips. On November 11, 1995, Second Wave sent Power a purchase order for 5000 chips. By
April 1996, Second Wave still had not received any chips. Second Wave abandoned its efforts
to acquire the chips in May 1996.

 Denis Precheur, Apple's product marketer in charge of the Stargate project,
testified that Apple did not make its final payment to Power pursuant to the terms of the Power-Apple contract because delivery of the Stargate chips was late. Precheur also testified that Apple
did not contract with Second Wave to market the chips for several reasons, including that as
Power struggled to manufacture the Stargate chip in a timely manner, the introduction of the new
PCI-based computers exceeded expectations, thus decreasing Apple's need for a NuBus-to-PCI
bridge product. Nonetheless, Precheur testified that he had expected the Stargate chip to be made
available to Second Wave and that he communicated that belief to Power and Second Wave on
more than one occasion. Precheur also testified that he told Roger Storer that Second Wave would
be allowed to purchase the Stargate chip from Power at cost.

 Having reviewed the record in its entirety, we conclude that the evidence provides
a reasonable basis for differing conclusions by reasonable minds as to whether the parties intended
to enter into a contract by which Second Wave would purchase Stargate chips from Power at cost
by June 1995; thus, we hold the evidence is sufficient to uphold the submission of question
number four to the jury. See Tex. R. Civ. P. 279. Furthermore, viewing the evidence in the
light most favorable to Second Wave as we must, we hold there is sufficient evidence to support
the jury's findings that Power agreed to supply Second Wave with Stargate chips at cost by June
1995 and that Power failed to comply.

 Having concluded that legally sufficient evidence supports the submission of
question four to the jury and the jury's affirmative answer to that question, we now must
determine whether the evidence is factually sufficient to support the jury's finding that the parties
intended to enter into a contract. In reviewing a jury finding to determine factual sufficiency, we
consider and weigh all the evidence and set aside the finding only if the evidence is factually so
weak, or the verdict so contrary to the overwhelming weight of the evidence, as to make the
finding clearly wrong and manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986); Garza, 395 S.W.2d at 823.

 "In a case such as this where there is no actual contract in evidence, and one party
attests to a contractual agreement while the other vigorously denies any meeting of the minds,
determination of the existence of a contract is a question of fact." Runnells v. Firestone, 746
S.W.2d 845, 849 (Tex. App.--Houston [14th Dist.] 1988, writ denied) (citing Haws & Garrett
Gen. Contractors, Inc. v. Gorbett Bros. Welding Co., 480 S.W.2d 607, 610 (Tex. 1972)). 
Certainly, evidence was presented that supported Power's theory that no contract existed. As fact-finder, the jury was presented with evidence that Second Wave's first purchase order for the
Stargate chips was sent to Power in October 1995, three months after the alleged due date for the
finished chips. Furthermore, Winegarden testified that the chip sought by Second Wave was not
the chip being designed by Power, as the Stargate chip was never intended to function with
Macintosh 601 power PCs. Based on this testimony, Power argues that, while there was evidence
of the final cost of Stargate, it is irrelevant because there was no evidence of the cost of the
"mythical ASIC" upon which Second Wave based its contract claim. Finally, there was evidence
that Power, by virtue of its contract with Apple, was prohibited from selling Stargate to anyone
other than Apple and Apple's designees. Second Wave was not designated by Apple to receive
Stargate. (2)

 Notwithstanding this evidence, we do not believe that the jury's findings, based on
the testimony of Storer and Apple's Precheur, as well as the numerous e-mails and telephone
conversations concerning the manufacturing and sale of Stargate, are so against the great weight
and preponderance of the evidence as to be manifestly unjust. Nor do we believe that the essential
terms of the contract are so indefinite as to be unenforceable as a matter of law. We overrule
Power's sixth issue.

 In its first issue, Power argues there was no evidence or, alternatively, insufficient
evidence to support Second Wave's recovery of lost profits. Power contends that while lost profit
damages do not require that the loss be susceptible to exact calculation, the plaintiff must establish
the amount of lost profits with reasonable certainty. See Texas Instruments, Inc. v. Teletron
Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994). Power argues the evidence supporting
Second Wave's recovery of lost profits fails the reasonable-certainty test because there was no
evidence that (1) a chip meeting Second Wave's specifications could have been produced by any
company; (2) a Macintosh 601-compatible chip could have been produced in time to capture the
alleged profits; or (3) a Macintosh 601-compatible chip could have been produced at the cost
necessary to generate the alleged profits.

 In Teletron, Texas Instruments ("TI") agreed to build ten working prototypes of
a voice-prompted, programmable thermostat designed by Teletron within eleven weeks for
$32,000. See id. at 277. There was no comparable device on the market, and the prototypes
were to incorporate state-of-the-art microprocessors, software, and hardware. See id. After
nearly two years of failed attempts, TI halted its efforts, and Teletron sued for breach of contract,
breach of warranty, violations of the DTPA, negligence, breach of fiduciary duty, and fraud. See
id. The jury found Teletron's damages to be $100,000 in expenses, $500,000 for past lost profits,
and no damages for future lost profits. See id. The trial court rendered judgment on the verdict
but refused to award Teletron lost profits. See id. The court of appeals modified the trial court
judgment to include $500,000 for past lost profits. See id.

 The supreme court began its discussion of the case by reaffirming its rule for
recovery of lost profits. See id. at 278-79 (citing Southwest Battery Corp. v. Owen, 115 S.W.2d
1097, 1098-99 (Tex. 1938)). In Owen, a partnership was formed to sell automobile batteries on
consignment from Southwest Battery. See 115 S.W.2d at 1098. For a short time, Southwest
Battery complied with the contract, and the partnership sold a substantial number of batteries to
businesses throughout East Texas. See id. When Southwest Battery breached the contract, the
partnership lost its customers and had to discontinue that portion of its business. See id. at 1099.

 The Owen court held that, because the evidence showed both the business
transacted during the period of contract compliance and the sales the partnership could have
expected had Southwest Battery continued to comply, the partnership was entitled to recovery for
the loss of its profits. See id. The court reasoned:

[w]here it is shown that a loss of profits is the natural and probable consequences
of the act or omission complained of, and their amount is shown with sufficient
certainty, there may be a recovery therefor; but anticipated profits cannot be
recovered where they are dependent upon uncertain and changing conditions, such
as market fluctuation, or the chances of business, or where there is no evidence
from which they may be intelligently estimated. So evidence to establish profits
must not be uncertain or speculative. It is not necessary that profits should be
susceptible of exact calculation, it is sufficient that there be data from which they
may be ascertained with a reasonable degree of certainty and exactness.


Id. at 1098. Applying this rule to the facts before it, the court in Teletron concluded that because
a working model of Teletron's thermostat had never been produced or sold, there was no evidence
to prove with reasonable certainty what profits Teletron lost due to TI's failure to perform its
contract. See Teletron, 877 S.W.2d at 280-81.

 We find the facts of the present case to be more analogous to Owen than to
Teletron. Unlike Teletron, the product for which Second Wave claims lost profits was eventually
manufactured. Furthermore, Second Wave presented evidence that it sold thousands of NuBus-
to-PCI bridge products incorporating its more costly multiple-chip solution while waiting for
Power to deliver Stargate. Second Wave's damages were caused by Power's failure to deliver
fully-functioning Stargate chips at a specified price in a timely manner, not by the lack of viability
of the product or the speculative nature of the market. While it is true that the completed Stargate
chip did not meet Second Wave's product specifications, at no time did Power inform Second
Wave that the chip was not being manufactured to be compatible with the 601 Macintoshes, as
Second Wave expected it would be; instead, Power received chip specifications from Second
Wave. Furthermore, the jury heard evidence that the incompatibility was caused by a mistake
made by Power engineers during production.

 "What constitutes reasonably certain evidence of lost profits is a fact intensive
determination." Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992). Recovery
for profits lost does not require that the loss be susceptible of exact calculation, but the amount
of the loss must be shown by competent evidence with reasonable certainty. See id. (citing White
v. Southwestern Bell Tel. Co., 651 S.W.2d 260, 262 (Tex. 1983)). At a minimum, lost profit
estimates must be based on "objective facts, figures, or data from which the amount of lost profits
can be ascertained." Id.

 The jury in this case was presented with testimony by Storer explaining the
difference in cost between the Second Wave expansion chassis with multiple chips and the chassis
with the Power Stargate chip. An exhibit was introduced into evidence that calculated damages
based on the actual number of Second Wave chassises shipped during defined time periods,
multiplied by the cost difference per unit. The exhibit listed lost profits of $482,817.50 for units
shipped from June 1, 1995 to July 15, 1996 and $597,405.48 for units shipped from July 16, 1996
to March 6, 1999. The jury awarded $500,000 for past damages and $10,000 for future damages. 
Considering all the relevant evidence, we cannot say as a matter of law that Second Wave was not
entitled to recover these lost profits. We overrule Power's first issue.


CONCLUSION


 Having overruled Power's first and sixth issues, we conclude that Second Wave
was entitled to $510,000 in actual damages as a result of the jury's affirmative responses to
questions four and five, as well as to its attorney's fees. As the final judgment awards Second
Wave those amounts, we need not consider Power's issues related to Second Wave's other causes
of action. We affirm the judgment of the district court.



 


 Jan P. Patterson, Justice

Before Justices Jones, Kidd and Patterson

Affirmed

Filed: May 31, 2000

Do Not Publish

1. The jury also awarded Second Wave attorney's fees through the date of judgment of
$86,000, as well as $13,000 for an appeal to this Court, $6000 for making or responding to a
petition for review, and $6000 in the event the petition for review is granted.
2. Second Wave's Storer testified he was unaware of the Apple/Power contract's prohibition
on the sale of Stargate to non-designees until after Second Wave sued Power.


Id. at 1098. Applying this rule to the facts before it, the court in Teletron concluded that because
a working model of Teletron's thermostat had never been produced or sold, there was no evidence
to prove with reasonable certainty what profits Teletron lost due to TI's failure to perform its
contract. See Teletron, 877 S.W.2d at 280-81.

 We find the facts of the present case to be more analogous to Owen than to
Teletron. Unlike Teletron, the product for which Second Wave claims lost profits was eventually
manufactured. Furthermore, Second Wave presented evidence that it sold thousands of NuBus-
to-PCI bridge products incorporating its more costly multiple-chip solution while waiting for
Power to deliver Stargate. Second Wave's damages were caused by Power's failure to deliver
fully-functioning Stargate chips at a specified price in a timely manner, not by the lack of viability
of the product or the speculative nature of the market. While it is true that the completed Stargate
chip did not meet Second Wave's product specifications, at no time did Power inform Second
Wave that the chip was not being manufactured to be compatible with the 601 Macintoshes, as
Second Wave expected it would be; instead, Power received chip specifications from Second
Wave. Furthermore, the jury heard evidence that the incompatibility was caused by a mistake
made by Power engineers during production.

 "What constitutes reasonably certain evidence of lost profits is a fact intensive
determination." Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992). Recovery
for profits lost does not require that the loss be susceptible of exact calculation, but the amount
of the loss must be shown by competent evidence with reasonable certainty. See id. (citing White
v. Southwestern Bell Tel. Co., 651 S.W.2d 260, 262 (Tex. 1983)). At a minimum, lost profit
estimates must be based on "objective facts, figures, or data from which the amount of lost profits
can be ascertained." Id.

 The jury in this case was presented with testimony by Storer explaining the
difference in cost between the Second Wave expansion chassis with multiple chips and the chassis
with the Power Stargate chip. An exhibit was introduced into evidence that calculated damages
based on the actual number of Second Wave chassises shipped during defined time periods,
multiplied by the cost difference per unit. The exhibit listed lost profits of $482,817.50 for units
shipped