In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-00-00752-CV

____________


MUNTERS CORPORATION, Appellant


V.


SWISSCO-YOUNG INDUSTRIES, INC., Appellee






On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 92-15607






OPINION ON REHEARING

 We deny Munters Corporation's motion for rehearing. We withdraw our
previous opinion and judgment dated April 11, 2002, and issue this opinion in its
stead.

 This appeal arises from a suit based on deceptive trade practices. Appellant
appeals the trial court's judgment in favor of appellee. We affirm.

Background


 In early 1990, appellee Swissco-Young Industries, Inc. (Swissco) contracted
with Harbor Cogeneration (Harbor) to design and install a system that would increase
the electric output from Harbor's cogeneration turbine. Part of this design
incorporated two components, Plasdek and mist eliminators, that were supplied by
appellant Munters Corporation (Munters). 

 The contract between Swissco and Harbor required that certain performance
requirements be met before Swissco was entitled to payment. These requirements
included: (1) the cooling achieved by the system had to meet or exceed a scale of
temperature drops that varied with the outside temperature and humidity; (2) the
pressure drop caused by the Plasdek could not exceed .98 inches of water; (3) the mist
eliminators were required to eliminate 99% of particles larger than 30 microns; and
(4) the pressure drop caused by the mist eliminators could not exceed .27 inches of
water. 

 On March 11, 1991, Harry Locher, the founder of Swissco, sent a fax to Ben
Flynn, a Munters engineer. The fax asked for assurances that there would be no
problems with pressure drops and turbulence. On March 12, 1991, Flynn sent a reply
fax containing a mist collector proposal and providing data on how the product would
perform. 

 Swissco purchased the products and installed the system. The mist eliminators
did not perform as expected during testing. For example, the mist eliminators'
pressure drop was 992% higher than expected, and water spray was visible. The test
also noted that "[a]ir velocities ranged from 1000-6000 plus feet per minute around
[mist eliminator]. Since [mist eliminators] do not operate at these high air velocities,
this represents a significant design problem." The Plasdek pressure drop was 57%
higher than expected, which was also a failure. Because the system did not meet the
performance requirements, Harbor refused to pay Swissco. When Swissco contacted
Munters to determine why the mist eliminators did not work, Munters did not provide
any assistance. Subsequently, Swissco declared bankruptcy. 

 After a bench trial, the trial court ruled that Munters had violated the Deceptive
Trade Practices Act (DTPA) by misrepresenting the quality of the mist eliminators. 
Judgment was rendered awarding Swissco $974,866.02 in damages, plus prejudgment
interest, statutory additional damages, and attorney's fees. 

 On appeal, Munters argues that the evidence was legally and factually
insufficient that: (1) it made a misrepresentation under the DTPA; (2) its violation
of the DTPA was a producing cause of Swissco's failure; and (3) Swissco suffered
lost profits of $974,886.02. 



Standard of Review


 Findings of fact entered in a case tried to the bench are of the same force and
dignity as a jury's verdict upon special questions. Guerra v. Garza, 865 S.W.2d 573,
575 (Tex. App.--Corpus Christi 1993, writ dism'd w.o.j.) (citing City of Clute v. City
of Lake Jackson, 559 S.W.2d 391, 395 (Tex. Civ. App.--Houston [14th Dist.] 1977,
writ ref'd n.r.e.)). The trial court's findings of fact are reviewable for legal and
factual sufficiency of the evidence to support them by the same standards as are
applied in reviewing the legal and factual sufficiency of the evidence supporting a
jury's answer to a special question. Guerra, 865 S.W.2d at 575.

 When reviewing a legal insufficiency point of error, we consider only the
evidence and inferences, when viewed in their most favorable light, that tend to
support the finding and disregard any evidence and inferences to the contrary.
Sherman v. First Nat'l Bank, 760 S.W.2d 240, 242 (Tex. 1988). Under such a point,
we are limited to reviewing only the evidence that tends to support the finding. Id. 
If there is more than a scintilla of evidence that supports the finding, we must
overrule the point, and uphold the finding. Id.

 When reviewing a factual insufficiency point, we examine all of the evidence,
both the evidence that supports the finding and the evidence that controverts the
finding. Lofton v. Texas Brine Corp., 720 S.W.2d 804, 805 (Tex. 1986); Otis
Elevator Co. v. Joseph, 749 S.W.2d 920, 923 (Tex. App.--Houston [1st Dist.] 1988,
no writ). We can set aside the finding only if it is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust. Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986). In a bench trial, the trial court, as fact-finder, is the sole judge
of the credibility of the witnesses. Southwestern Bell Media, Inc. v. Lyles, 825
S.W.2d 488, 493 (Tex. App.--Houston [1st Dist.] 1992, writ denied). The judge may
take into consideration all the facts and surrounding circumstances in connection with
the testimony of each witness and accept or reject all or any part of that testimony. 
Id.
DTPA


 In its first issue, Munters argues that the evidence was legally and factually
insufficient to show that Munters made a misrepresentation of material fact. 
Specifically, it challenges the legal and factual sufficiency of the evidence to support
the trial court's conclusion of law 1 and findings of fact 10 and 11.

In its conclusion of law, the trial held:


 (1) Munters violated the DTPA by representing that the demisters
had benefits they did not have.


In its findings of fact, the trial court found:


(10) On March 12, 1991, Munters' engineer Ben Flynn
faxed a response to Locher, assuring him that the matter
had been looked in to by Munters' Engineering Department
and that the mist eliminators, as fabricated by Munters,
would be sufficient for the evaporative cooling system.


(11) Munters' literature assured Swissco that Munters
could provide accurate data about how the mist eliminators
would perform in the Harbor CoGen job.


 a. Misrepresentation 

 The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the
conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a) (Vernon
Supp. 2002). Section 17.46(b) provides a laundry list of specifically prohibited acts. 
Sections 17.46(b)(5) prohibits "false, misleading, or deceptive acts or practices
includ[ing] . . . representing that goods and services have characteristics, uses, [or]
benefits . . . which they do not have." Id. § 17.46(b)(5).

 Actionable representations may be oral or written. Hedley Feedlot, Inc. v.
Weatherly Trust, 855 S.W.2d 826, 838 (Tex. App.--Amarillo 1993, writ denied). A
party is not required to prove intent to make a misrepresentation under section
17.46(b)(5); making the false representation is itself actionable. Smith v. Baldwin,
611 S.W.2d 611, 616-17 (Tex. 1980).

 The evidence shows that Swissco contracted with Harbor to make its turbine
more efficient during the summer. To meet this end, Swissco proposed to cool the
air before it entered the turbine by utilizing a two-step system: step one put the water
in; step two took the water out. 

 Because of engineering complexities, Swissco looked to Munters for the
latter's engineering expertise. Munters supplied Plasdek, which puts the water in. 
As the air blows through to the turbine, the air is cooled by falling water. However,
as air speed increases, some water is caught in the airstream, resulting in damage to
the turbine. To solve this problem, Munters supplied a mist eliminator, designed to
catch water droplets before they reach the turbine. 

 In a fax letter sent on March 11, 1991, Locher asked whether the system would
overcome problems with turbulence or pressure drop in order to meet Harbor's
performance requirements. Locher testified that he was "trying to see if Munters'
product would work in this arrangement, and if so, what results we could expect from
Munters, from the system, because [he] didn't have the expertise." Flynn's faxed
response stated that: (1) a Munters T-130 was the appropriate collector [mist
eliminator]; (2) the pressure drop [mist eliminator] would be .38 inches; and (3) the
limit on water droplet size would be 24 microns. (1) Flynn also stated that he felt "a lot
better about the velocity and the P [mist eliminator pressure drop] [which is] more
in line with what [Locher] wanted." Swissco purchased the mist eliminators to
prevent the water from going into the turbine. 

 In addition, Locher testified that Munters's sales literature gave him the
impression that Munters's representations were accurate. Munters's sales literature
stated, "Munters is able to solve your separation problem by choosing the most
suitable mist eliminator for the job," and "[u]sing Munters' CAD (2) capabilities, data
reflecting actual operating conditions can be quickly generated." 

 When the products were installed, and the system was tested, the mist
eliminators did not work. Testimony showed that "it was like it was raining." The
droplet size was visible, and the pressure drop did not meet Harbor's requirements. 
In the end, the Swissco system failed its test. 

 1. Puffing

 Munters contends that Flynn's statement can only rise to the level of an opinion
or "puffing." The DTPA does not mention "puffing" as a defense. However, the
Texas Supreme Court has recognized that "mere puffing" statements are not
actionable under section 17.46(b)(5). Pennington v. Singleton, 606 S.W.2d 682, 687
(Tex. 1980). Courts have generally considered three factors in determining whether
a statement is actionable or mere puffing or opinion. Hedley Feedlot, 855 S.W.2d 
at 839. 

 First, the court must examine the specificity of the alleged misrepresentation. 
Id. (citing Autohaus v. Aguilar, 794 S.W.2d 459, 462 (Tex. App.--Dallas 1990), writ
denied per curiam, 800 S.W.2d 853 (Tex. 1991)). An imprecise or vague
representation constitutes a mere opinion. Id. Although general or indefinite
statements may support recovery under the DTPA, they must be examined in light of
the particular facts of the case. Id. (citing Autohaus, 794 S.W.2d at 464). 

 Second, courts compare the knowledge of the buyer and the seller. Id. (citing
Autohaus, 794 S.W.2d at 463). Superior knowledge of a seller, in conjunction with
the buyer's relative ignorance, operates to make the slightest divergence from mere
praise into representations of fact effective as a warranty. United States Pipe &
Foundry Co. v. City of Waco, 130 Tex. 126, 108 S.W.2d 432, 436-37 (1937).

 Finally, the courts look at whether the representation pertains to a past or
current event or condition, or to a future event or condition. Hedley Feedlot, 855
S.W.2d at 839. Misrepresentations concerning future conditions or performance of
a good or service are actionable under the DTPA. Smith v. Baldwin, 611 S.W.2d 611,
615-16 (Tex. 1980). A general statement concerning a future event, however, should
be looked at differently than a statement concerning a past or present event or
condition. Autohaus, 794 S.W.2d at 464.

 Flynn represented that the T-130 demister was the appropriate collector and
that the water droplet size would be 24 microns. The evidence showed that the mist
eliminators did not work as he represented. These statements were not
generalizations that are usually held to amount to mere opinion or puffing. See
Bradford v. Vento, 48 S.W3d 749, 759 (Tex. 2001) (holding that the statement that
defendant would "take care of" plaintiff in January was simply too vague and thus,
nonactionable); Douglas v. Delp, 987 S.W.2d 879, 886 (Tex. 1999); Autohaus, 794
S.W.2d at 464-65. Rather, the statements made in the present case were specific
representations about which mist eliminator would be appropriate, and how that
particular mist eliminator would perform in the future. The evidence further indicated
that Munters possessed superior knowledge about the performance capabilities of this
product. Accordingly, after considering all the evidence, we conclude that Swissco
presented legally and factually sufficient evidence of a misrepresentation of material
fact.

 2. Misinformation

 Munters also argues that it could not have made a misrepresentation because
Swissco provided misinformation about the design. Specifically, Munters asserts that
because Locher's March 11 fax stated that velocity would equal 1082 feet per minute,
and later test results showed that the velocity went as high as 6000 feet per minute,
Munters could not have misrepresented the benefits of its demister. 

 At trial, Flynn testified that he had multiple conversations with Locher about
the velocity of air traveling through to the turbine. Flynn stated, "I explained to Mr.
Locher that all of the figures which I had given him were dependent upon the gas-in
this case air-being distributed across the inlet face of the mist eliminator within plus
or minus 25% of average." He further stated that the "average value is what I had
taken from Mr. Locher's number here of 1138 feet per minute" and "all my answers
were precluded upon the airflow being within this plus or minus 25%." He also
testified that he told Locher over the phone that, "we would not under any
circumstances take responsibility for gas flow being within plus or minus 25%." 
Flynn agreed that he was aware that air velocities could be higher than those in the
March 11 fax, but only by plus or minus 25%. 

 Locher testified that his calculations in the March 11 fax were what he hoped
the velocity of air would equal. He was not sure of the velocity of air; and that is why
he wrote the March 11 fax to Flynn. He believed that Flynn would know the correct
velocity because Munters had stated that it had the capabilities to design and make
those calculations. He also testified that he sent the March 11 fax because he was
"trying to see if Munters' product would work in this arrangement and if so, what
results we could expect from Munters, from the system, because I didn't have the
expertise." 

 The trial court heard conflicting testimony from Locher and Flynn. In
reviewing the evidence, we accord due deference to the trial court, which, as the trier
of fact presented with conflicting testimony, is the sole judge of the credibility of the
witnesses and the weight to be given their testimony. Southwestern Bell Media, Inc.,
825 S.W.2d at 493. As the sole trier of fact, the trial court is free to believe one
witness and disbelieve others; the court may resolve inconsistencies in a witness's
testimony. Id. Here, the trial court could have believed Locher's testimony that he
sent the fax in order to discover if the mist eliminator would work under the
conditions presented and if velocity would be a problem. We conclude that the trial
court's rejection of Munters's defense is supported by sufficient evidence. 

 We overrule Munters's first issue.

c. Producing Cause

 In Munters's second issue, it asserts that the evidence is legally and factually
insufficient to show that its misrepresentations, if any, were the producing cause of
Swissco's injuries. Specifically, it challenges the legal and factual sufficiency of the
evidence to support the trial court's conclusions of law 2 and 5 and the trial court's
findings of fact 31, 32, 33, and 34.

 In its conclusions of law, the trial court held:

(2) Munters' violation of the DTPA was a producing cause
of Swissco's failure.


(5) The evidence shows that Swissco, due to Munters'
violation of the DTPA, lost specific, ongoing profitable
contracts, that new contracts from former Swissco
customers were serviced by the company Mr. Locher
worked for after Swissco's failure, and that such contracts
likely would have gone to Swissco had Swissco not failed.


 In its findings of fact, the trial court found:

(31) Swissco's bankruptcy was caused by the false
representations made by Munters regarding the mist
eliminators.


(32) Because of its two-decade history of profitability, it is
likely, had the false representations not been made,
Swissco would have continued to be a profitable company.


(33) As a result of the false response, Swissco lost
$974,866.02 in profits.


(34) Swissco, due to the failure, lost specific, ongoing,
profitable contracts, and new contracts from former
Swissco customers which were serviced by the company
Mr. Locher worked for after Swissco's failure, which
contracts likely would have gone to Swissco had Swissco
not failed.


 To recover under the DTPA, the plaintiff must show that the defendant's
actions were the "producing cause" of actual damages. See Tex. Bus. & Com. Code
Ann. § 17.50(a) (Vernon Supp. 2002). This showing requires some evidence that the
defendant's act or omission was a cause in fact of the plaintiff's injury. Doe v. Boys
Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 481 (Tex. 1995). Under this standard,
it is not necessary to show that the harm was foreseeable. Id.

 Locher testified that he would not have purchased Munters's products had
Flynn stated that his calculations on pressure drop and limit drop were only good
under certain gas distribution conditions. As analyzed in the first issue, the evidence
showed that Munters misrepresented the quality of its products, and that Munters's
misrepresentations prevented Swissco from meeting its contractual obligations with
Harbor. Thus, Swissco did not get paid by Harbor. Therefore, Swissco suffered
actual damages flowing from the misrepresentation of Munters.

 Justin Nagesh, Swissco's accountant, described Swissco as a healthy company,
with revenues of half a million to two million dollars. Swissco never bounced a
check, always paid its taxes timely, and never missed a payroll. When the Harbor
contract was terminated, Swissco lost more than $200,000 on the project, and it was
unable to pay major suppliers. Swissco lost two months worth of revenue, and
suppliers placed Swissco on COD status. He opined that Swissco's failure and
bankruptcy was a result of not being able to collect the $315,000 payment from
Harbor.

 Munters's expert, Robert Barr, generally did not agree with Swissco's expert.
Barr testified that losing the Harbor contract could not have been the sole reason for
entering bankruptcy. He testified that Swissco was financially insecure even before
Munters shipped the products. He concluded that losing the Harbor contract was only
one factor precipitating Swissco's bankruptcy. 

 Here, the evidence showed that Munters misrepresented the quality of its
products. Because the products did not perform as expected, Swissco could not
satisfy the performance requirements of the contract. As a result, Harbor paid nothing
to Swissco. The trial court then heard conflicting testimony about what caused
Swissco to declare bankruptcy. As the sole finder of fact, the trial court was free to
believe Nagesh's testimony that the loss of the Harbor contract caused Swissco to
declare bankruptcy. After reviewing all the evidence, we conclude that Swissco
presented sufficient evidence on producing cause.

 We overrule Munters's second issue. 

 d. Damages

 In Munters's third point of error, it argues that the evidence was legally and
factually insufficient to support the trial court's conclusions of law 3, 5, and 6 and
finding of fact 33. 

 In its conclusions of law, the trial court concluded that:

(3) The evidence supports Swissco's recovery of lost
profits of $974,868.02. 


(5) The evidence shows that Swissco, due to Munters'
violation of the DTPA, lost specific, ongoing profitable
contracts, that new contracts from former Swissco
customers were serviced by the company Mr. Locher
worked for after Swissco's failure, and that such contracts
likely would have gone to Swissco had Swissco not failed.


(6) Swissco proved its lost profits with reasonable certainty
by one complete calculation.


 In its findings of fact, the trial court found:

(33) As a result of the false responses, Swissco lost
$974,866.02 in profits.


 Recovery for lost profits does not require that the loss be susceptible to exact
calculation. Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276,
279 (Tex. 1994). The injured party must do more, however, than merely show that
it suffered some lost profits. Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649
(Tex. 1994). The loss amount must be shown by competent evidence with reasonable
certainty. Id. This is a fact-intensive determination. Id. At a minimum, opinions or
lost-profit estimates must be based on objective facts, figures, or data from which the
lost-profits amount may be ascertained. Id.

 Nagesh testified about Swissco's lost profits. Swissco's exhibit 39 details
Nagesh's opinion on the value of the loss of income and business that it lost between
the time Swissco filed for bankruptcy and when it started building up the new
business. Nagesh concluded that in total, Swissco lost $1,911,000 in profits. This
amount was based on the discounted value of the loss in income and the discounted
value of the terminal value of the company. The loss in income occurred between
1991 to 1999. For each year, Nagesh used an amount of income that the company
would have lost and discounted it. These amounts were also based on forecasted cash
flow from historical data. The terminal value of the company was the amount of
money that the company could be sold for. In making these calculations, Nagesh
used a 10% discount factor. Nagesh testified that the discount factor is determined
by the subjective intent of the accountant. 

 Locher also testified about lost profits. While he worked for CPI, (3) Locher
testified that there were at least five projects that would have been handled by
Swissco had it remained in business. One specific contract was for Dow Chemical,
in which Swissco supplied approximately $300,000 to $500,000 in air filters a year.
Further, Swissco had been doing business since 1969. 

 Munters's expert, Robert Barr, disagreed with Nagesh's valuation report. Barr
testified that Nagesh's numbers used for his conclusion were unreliable. The methods
that Nagesh used were not in compliance with generally accepted accounting
principles. In 1991, Barr did not believe that Swissco was a profitable company. 
Barr also testified that the discount factor should have been somewhere in the
twenties, and that the estimate on future profits beyond five years was pure
speculation. 

 We conclude that Swissco presented sufficient evidence on lost profits. 
Swissco's accountant gave his opinion on lost profits based on objective facts,
figures, and historical data. Locher also testified about contracts that Swissco lost
after it declared bankruptcy. Moreover, the trial court heard conflicting testimony
about Swissco's lost profits and the underlying data used to calculate the amount. As
the sole finder of fact, the trial court was free to believe that Nagesh gave a
reasonably certain estimate on lost profits, while disbelieving the testimony of Barr. 
Southwestern Bell Media, Inc., 825 S.W.2d at 493. Accordingly, after reviewing all
the evidence, we conclude that Swissco presented legally and factually sufficient
evidence on damages. 

 We overrule Munters's third issue. 

Conclusion


 We affirm the judgment of the trial court. 

 

 Adele Hedges

 Justice


Panel consists of Justices Mirabal, Hedges, and Jennings.


Justice Mirabal dissenting. 


Do not publish. Tex. R. App. P. 47.
1. Water droplet size of 24 microns cannot be seen by the naked eye.
2. Computer aided design.
3. CPI took over Swissco's clients. Locher continued to service customers in the
commercial air filter industry with gas turbine needs.